## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MJ'S MARKET, INC.,

                      Plaintiff,

    v.

JUSHI HOLDINGS, INC., JUSHI MA,
INC., JUSHI, INC., SAMMARTINO
INVESTMENTS LLC, NATURE'S
REMEDY OF MASSACHUSETTS,
INC., WWF LLC, MCMANN LLC,
VALIANT ENTERPRISES, LLC,
JOHN BRADY, ROBERT CARR, JR.,
and JUSTIN LUNDBERG,

                    Defendants.

Civil Action No.:

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff MJ's Market, Inc. ("Plaintiff" or "MJ's") brings this action against defendants Jushi

Holdings, Inc. ("Jushi Holdings"), Jushi Inc. ("Jushi Inc."), Jushi MA, Inc. ("Jushi MA") (Jushi

Holdings, Jushi Inc. and Jushi MA are collectively "Jushi"); Sammartino Investments LLC

("Sammartino"), Nature's Remedy of Massachusetts, Inc. ("NRM"), WWF LLC ("WWF"),

McMann LLC ("McMann"), John Brady ("Brady"), Robert Carr, Jr. ("Carr") and Justin Lundberg

("Lundberg") (Brady, Carr, Lundberg and NRM are collectively "Nature's Remedy") and Valiant

Enterprises, LLC ("Valiant") (collectively the "Defendants") for violations of the federal Antitrust

statute and Plaintiff's state rights.

This action involves a bad-faith and unlawful conspiracy to restrain trade in violation of

federal antitrust laws and Massachusetts unfair business practices laws that was premeditated and

orchestrated by Defendant Jushi Holdings, a publicly listed, multi-state behemoth cannabis operator

with thirty-seven retail locations across the United States. With tens of millions of dollars at stake, and driven by express anti-competitive contractual incentives, Defendants planned a series of calculated actions and conspired to violate federal antitrust laws, unlawfully restrain trade, and prevent Plaintiff from being able to actualize its contractual and land use rights, develop a competing facility, and enter the Tyngsborough marketplace.

While the players involved in this case have contact with the cannabis industry which was legalized in the Commonwealth of Massachusetts (for medical and/or recreational use) and in a majority of other states throughout the country, this action and Plaintiff's claims for relief are not industry dependent. Plaintiff and Defendants could be involved in any product or service business and the same facts and allegations asserted here -- involving the abuse and misuse of the land use permitting and legal process for anti-competitive reasons -- would violate federal and state antitrust and unfair competition laws in precisely the same way. For these reasons, and precisely because the conduct at issue is prohibited under the comprehensive federal antitrust law over which this Court has exclusive jurisdiction, Plaintiff has filed its claims in this Court.

## INTRODUCTION

1.      MJ's Market, Inc. is a small, closely-held Massachusetts corporation established in May 2018 to engage in the legalized cannabis industry in Massachusetts. Unlike Defendants' multi-state and multinational corporate organization, Plaintiff is funded by a diverse, local, and community-based group with strong ties to the greater Merrimack Valley region in which Plaintiff seeks to operate.

2.      More than two years ago, Plaintiff began its odyssey to obtain and secure the necessary permits and approvals to break ground on a new facility in Tyngsborough, which would be Plaintiffs' second store in Massachusetts.

3.     Plaintiff's facility in Tyngsborough would establish competition, bring consumers lower prices and expanded services, and deliver significantly greater tax revenue to the Town of Tyngsborough ("Tyngsborough" or "Town") and Commonwealth of Massachusetts ("Commonwealth" or "State").

4.     To develop its facility and bring these benefits to the greater community, Plaintiff was required to obtain land use approval from Tyngsborough's Select Board (the "Select Board"), the Planning Board ("Planning Board"), Zoning Board of Appeals ("ZBA") and Conservation Commission ("Conservation Commission"), among other State and local bodies having regulatory authority over Plaintiff's business.

5.     The barriers to entry into the marketplace are considerable; among them are extensive submittals to and approval through a review process exercised by the Massachusetts Cannabis Control Commission, the State's designated oversight authority; the need to enter a Host Community Agreement with the municipality; securing all local land use approvals; and significant financial costs associated with a buildable and permittable site.

6.     In and of themselves, these high barriers to entry severely limit new entrants to the market.  Entering the market in Tyngsborough is further complicated by the fact that only two retail operations are eligible for licensing within Tyngsborough's borders, and the Select Board only negotiated and entered Host Committee Agreements with applicants that committed to locating their retail businesses at specific identified sites and accepted the fact that these sites were in close proximity and would neighbor each other.

7.     At the time Plaintiff began its permitting and licensing efforts for a Tyngsborough facility, Defendant Nature's Remedy (now owned by Defendant Jushi) had already developed and opened the first of the two authorized facilities in Tyngsborough.  As a result of Defendant Jushi's

size, Defendants have a large local and national market presence and, by virtue of owning the only retail operation in Town control the market, hold monopoly power, which in turn gives Defendants the ability to artificially control prices.

8.      Contrary to the mantra espoused in documents widely distributed by Defendant Nature's Remedy, that "values are important" to Defendants, who "strive to lead by example and prioritize integrity and transparency," Defendants are engaged in an on-going illegal scheme designed to restrain trade, maintain their existing monopoly, and injure competition in the market for competitive goods and services, through the use of a series of sham petitions and other unlawful anticompetitive acts.

9.      Defendants' actions demonstrate an intent to maintain their existing monopoly and control the over $35 million per year (legalized and growing) adult, recreational cannabis market in Tyngsborough, Massachusetts and reap an ill-gotten financial windfall at the expense of consumers in northern Massachusetts and the greater Merrimack Valley region.

10.     Defendants' sham petitions and objections to Plaintiff's land use and permitting applications and approvals, lodged at every conceivable municipal level for an apparently evolving list of scattershot grievances, uniformly lacked merit and have consistently been unsuccessful.[1]

11.     In their most recent stunt, Defendants brazenly appealed the Planning Board and ZBA decisions approving Plaintiff's facility to the Massachusetts Superior Court claiming traffic impacts, among other frivolous harms, despite having failed to conduct any traffic analysis (the "Zoning Appeal"). Even Defendants' forum selection was designed to delay justice and further prevent competition; instead of filing their case in Massachusetts Land Court, which specializes in the

---

[1]     Every attempt Defendants have made to object or prevent Plaintiff from obtaining approval to develop and open its facility has been unsuccessful and roundly rejected in all aspects except one—delaying Plaintiff from entering the market. Indeed, not one member of any administrative tribunal, board, or commission has decided in favor of Defendants on any issue.

adjudication of zoning and land use matters and purposefully expedites its review in such cases, Defendants intentionally filed the Zoning Appeal in Massachusetts Superior Court to evade specialized and timely review.

12.     While Defendants' challenges have uniformly been devoid of substance, they have accomplished Defendants' illicit purpose of heightening the barriers to entry in the market, harm competition as a whole, frustrate and delay Plaintiff's development efforts, and hold on to their monopoly.

13.     Defendants' conduct and the transparent lack of merit to their objections fall far short of the well-established antitrust immunity under the First Amendment's right to petition the government. By any objective or reasonably subjective standard, Defendants' baseless claims could not have been asserted with any expectation of victory on the merits. Defendants' purpose and intention all along has been to delay and impede Plaintiff's development and operations, allowing Defendants to maintain their complete market monopoly for as long as possible.

14.     Defendants' litigation strategy drew the rare ire of the Select Board, which in a letter from the Town Administrator to the Defendants expressed its *"deep disappointment"* in Defendants' move to use the court system to undermine the opening of *"a competing marijuana establishment."* The Select Board made clear that its disappointment was based *"on the fact that, at all times, Nature's Remedy and, subsequently, Jushi MA, Inc. were aware that the Town of Tyngsborough . . . intended to issue, and did issue, Host Community Agreements (HCAs) to two stores in close proximity to one another on Middlesex Road . . . for purposes of planning, public safety, and an agglomeration factor to help both businesses succeed."* Finally, the Select Board pointed out that its intention was *"publicly known prior to Jushi MA, Inc.'s merger with Nature's Remedy"* and that *"all HCA applicants were specifically asked if they knew and understood that a competing business may open in close proximity and they were asked if they would still like to proceed with the process. Nature's*

*Remedy understood this and chose to proceed."*

15. The implications are plain —Nature's Remedy gained its first-in-time local approval by expressly promoting and agreeing with the Town's desire to locate competing facilities in a cluster, and once operational and profiting from its uncontested grip on consumers, scarcely hesitated to reverse its position 180 degrees to actively oppose development of the second site with a second facility.

16. Defendants' unlawful conduct would have come as no surprise to the Select Board if the merger and acquisition agreement (the "M&A Agreement") Defendants entered into when Nature's Remedy was acquired by Jushi was shared with the Town in connection with the Town's approval of the transfer of Nature's Remedy's special permit and license to Jushi.

17. Executed a mere four days after Plaintiff received its Host Committee Agreement from the Select Board, the M&A Agreement expressly provides substantial economic incentives for Defendants to violate federal antitrust and state law unfair competition laws. Committing themselves to this path, Defendants conditioned millions of dollars' worth of consideration for the merger on their collective ability to prevent Plaintiff's retail facility from opening for a period of two and a half years. With a $15 million payout and tens of millions more in earnings on the line, the M&A Agreement plainly and unmistakably explains Defendants' egregious conduct in aggressively seeking to maintain their illegal monopoly. *See **Exhibit A,*** submitted herewith.

18. In addition to earning $15 million in additional compensation explicitly based in carrying out an unlawful, anti-competitive scheme, Defendants' conduct has frustrated and severely delayed Plaintiff's development process resulting in more than $45 million of lost revenue and saddling Plaintiff with hundreds of thousands of dollars of additional costs, legal fees and expenses fighting Defendants' bogus objections and zoning appeals. Consequently, Plaintiff seeks legal and equitable relief in this action to end Defendants' unlawful conduct and recover damages of no less

than $60 million (without consideration of exemplary or treble damages) for its losses, out of pocket costs, and to disgorge Defendants' unlawful benefits.

## **Parties**

19.     Plaintiff MJ's Market, Inc. is a Massachusetts corporation with a principal place of business at 13 Centennial Dr, North Grafton, Massachusetts.

20.     Defendant Jushi MA, Inc. is a Massachusetts corporation with its principal place of business at 301 Yamato Road, Suite 3250, in Boca Raton, Florida.

21.     Defendant Valiant Enterprises, LLC is a Massachusetts limited liability company with its principal place of business at 420 Middlesex Road, Tyngsborough, Massachusetts.

22.     Defendant Nature's Remedy of Massachusetts, Inc. was a Massachusetts corporation with its principal place of business at 69 Milk Street, Suite 10, Boston, Massachusetts which merged with Defendant Jushi MA, Inc. on September 10, 2021.

23.     Defendant Jushi Holdings, Inc. is a Canadian corporation with its principal place of business at 301 Yamato Road, Suite 3250, in Boca Raton, Florida.

24.     Defendant Jushi Inc. is a Delaware corporation with its principal place of business at 301 Yamato Road, Suite 3250, in Boca Raton, Florida.

25.     Defendant Sammartino Investments LLC is a Delaware limited liability company with its principal place of business at 69 Milk Street, Suite 110, Westborough, Massachusetts.

26.     Defendant WWF LLC, a Massachusetts limited liability company, is the successor company to Sammartino Investments LLC, with its principal place of business at 497 Hooksett Road, Suite 190, Manchester, New Hampshire.

27.     Defendant McMann LLC, a Massachusetts limited liability company with its

principal place of business at 420 Middlesex Road, Tyngsborough, Massachusetts.

28.     Defendant John Brady is an individual residing at 9 Ladd Street, Portsmouth, New Hampshire.

29.     Defendant Robert Carr, Jr. is an individual residing at 17 Vassar Street, Manchester, New Hampshire.

30.     Defendant Justin Lundberg is an individual residing at 24 Adams Street, Westborough, Massachusetts.

## Jurisdiction and Venue

31.     The claims in this action arise under the federal antitrust laws, 15 U.S.C. §§ 1, 2 and 15, and Massachusetts law.

32.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 15, and with respect to the violations of Massachusetts law, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

33.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 and 15 U.S.C. § 15 because Defendants are licensed to do business in Massachusetts and maintain principal places of business in Massachusetts.

## Factual and Legal Background

### Defendants Knew and Accepted that the Two Adult Retail Marijuana Establishments Permitted in Tyngsborough Were Planned to be Located at 420 Middlesex and 405 Middlesex

34.     In May 2018, the Town passed an amendment of its Zoning Bylaw (the "Zoning Bylaw") at town meeting to provide for the establishment of licensed marijuana businesses in appropriate locations and under reasonable conditions.  The Zoning Bylaw allows for adult use retail businesses only within the Business 3 District (the "B3 District") by way of special permit.

35.     With few isolated exceptions, the B3 District is a three-plus mile stretch along both sides of Middlesex Road, with a portion of the district located toward the north side of Town adjacent to the New Hampshire border and in proximity to the Pheasant Lane Mall and numerous other retail business centers. The B3 District is pocked with numerous undersized lots, many of which house existing businesses in close proximity to Defendant Jushi MA, Inc.'s retail facility.

36.     The Town formed an adult use marijuana sub-committee (the "Sub-Committee") to review and recommend marijuana retail businesses as finalists with which to negotiate host community agreements, as well as to determine the most appropriate and advantageous locations to site marijuana retail establishments within the community.

37.     The Sub-Committee favored clustering the two marijuana retail establishments in an area within the B3 District located away from the inner sections of the Town and as close to the border with New Hampshire as possible.  This steadfast intention was made known to any entity looking to submit an application for one of the two licenses.  In fact, acknowledgement of, and agreement to, such intent by each entity was a condition of the Town's favorable reception of any application seeking a Host Community Agreement.

38.     On September 24, 2018, the Board held a hearing to determine the two most advantageous sites for locating marijuana retail facilities and, in turn, the two operators with which it would enter negotiations.

39.     Three applicants were in the running during the Town's finalist considerations: Natures' Remedy, Royalty Group ("Royalty"), and Plaintiff.  Plaintiff was one the Sub-Committee recommended for approval.

40.     During the September 24th hearing, the Town's Chief of Police, Richard Howe ("Police Chief") underscored the Town's strong preference that marijuana retail businesses be located in close proximity to one another, stating that "it is very advantageous to have these

businesses right there next to each other," in "a highly patrolled area" by the police department.

41.    Defendant Nature's Remedy, highly attuned to the political winds guiding the Board, supported and actively endorsed the Police Chief's position to favor the clustering of marijuana retail operations at its proposed site located at 420 Middlesex Road ("420 Middlesex") and that of Royalty, located at 405-409 Middlesex Road ("405 Middlesex"). Indeed, Nature's Remedy's firm commitment to the two-site cluster was a material reason the Select Board voted to enter into negotiations with Nature's Remedy regarding a Host Community Agreement.

42.    Following the September 24th hearing, the Town negotiated and entered into Host Community Agreements with Nature's Remedy and Royalty.

43.    A further result of Nature's Remedy's endorsement of the two-site cluster including its site at 420 Middlesex and Royalty's site at 405 Middlesex was that the Town voted to deny Plaintiff's 2018 application for a Host Community Agreement, which proposed a site located at the opposite end of the B3 District, approximately three miles from the Select Board's favored cluster area.

44.    Nature's Remedy was able to capitalize on its Host Community Agreement and proceeded to obtain land use permits, develop its site and obtain a license from the State's Cannabis Control Commission.

45.    Although Royalty had entered into a Host Community Agreement with the Town in 2018 for its facility at 405 Middlesex, Royalty was unable to successfully proceed through permitting and development and its Host Community Agreement expired.

46.    Subsequently, with a purpose of maintaining the clustering of the two retail facilities, the Select Board chose Plaintiff to replace Royalty as the second approved marijuana retail establishment operator in Tyngsborough and negotiated and executed a Host Community Agreement with Plaintiff for the 405 Middlesex site.

47.     Nature's Remedy's acceptance and endorsement of the Town's two-site cluster outwardly represented that Defendants held no opposition to the development of the 405 Middlesex site with the second of the two facilities. Plaintiff's willingness to revise its plans, abandon its former site, and relocate its cannabis retail facility to the 405 Middlesex site relied in material part on these documented public affirmations of and commitments to the two-site cluster concept the Town favored.

**Defendant Nature's Remedy Obtains a Special Permit
and Develops 420 Middlesex with its Facility**

48.     Defendant Nature's Remedy pursued a special permit from the Planning Board during the course of negotiating its Host Community Agreement with the Select Board and prior to receipt of its Provisional License from the State's Cannabis Control Commission. The Planning Board held three public hearings on Defendant Nature's Remedy's special permit application on September 6, September 20, and November 15, 2018.

49.     Contrary to Defendants' stated position with respect to Plaintiff's application to the Planning Board, Nature's Remedy saw no issue seeking and obtaining Planning Board approval for its site prior to receiving other necessary approvals identified as required in the Zoning Bylaw for approval of a special permit. Defendants' legal philosophy with respect to permit approvals seems to embody "do as I say, not as I do."[2]

50.     Defendant Nature's Remedy was not required to, and did not, conduct any traffic analysis or submit any traffic impact report in connection with its special permit application. The Planning Board did not discuss or require any information pertaining to traffic at any of the public

---

[2]     Although Defendants Jushi MA, Inc. and Valiant Enterprises, LLC have challenged the decision granting special permit approval to Plaintiff on the basis that it was improperly conditioned on discretionary approvals by other bodies, one of the conditions ultimately placed on the special permit awarded to Nature's Remedy required it to receive its Provisional License from the State's Cannabis Control Commission. Defendants Jushi MA, Inc. and Valiant Enterprises, LLC apparently believe different rules should apply to them.

hearings concerning Defendant Nature Remedy's application.  Notwithstanding the lack of any mention of traffic, the Planning Board voted to approve Defendant Nature's Remedy's special permit with conditions and issued a written decision received in the Town's offices on December 6, 2018.[3]

51.     The Planning Board's findings in support of granting a permit to Nature's Remedy were no more detailed than those found in the decision granting Plaintiff's special permit; indeed, they are less detailed or specific to the required findings to issue a special permit.

52.     At the time the Planning Board voted to approve Nature's Remedy's special permit application, it had made no showing that traffic impacts from its project did not negatively impact traffic along Middlesex Road.  Thus, Nature's Remedy's has no way of demonstrating that traffic impacts from its use are any less impactful than those that would result from Plaintiff's project.

**Plaintiff Seeks and Obtains Approval to Pursue
Development of 405 Middlesex in Lieu of Royalty Group
Over Defendants' Frivolous Objections**

53.     On March 21, 2021, the Select Board voted in favor of granting a Host Community Agreement to Plaintiff in connection with its plan to develop a retail operation at 405 Middlesex, a location that the Select Board noted was "highly sought after" by the Sub-Committee.

54.     Despite Nature's Remedy's previously stated agreement with the Select Board, Sub-Committee, and Police Chief (among other Town officials) supporting a second marijuana dispensary located at 405 Middlesex, Defendants objected to the issuance of a host community agreement to Plaintiff and raised issues concerning (a) distances between Plaintiff's proposed

---

[3]     The thrust of Defendants' appeal of Plaintiff's special permit in Massachusetts Superior Court, is that the Planning Board arbitrarily and capriciously failed to require Plaintiff to submit a traffic impact study and to consider the effects of Plaintiff's proposed facility on traffic on Middlesex Road. Defendants leveled this claim despite the facts that (1) no such requirement exists in the Zoning Bylaw, (2) Natures' Remedy obtained its own special permit without having been required to submit a traffic study, and (3) at no point in Plaintiff's permitting process did the word "traffic" ever find its way into any written or oral opposition Defendants offered to Plaintiff's special permit application (something Defendants blatantly misled the Superior Court about in its appeal).  Jushi MA, Inc. and Valiant Enterprises, LLC apparently conjured up traffic concerns after Plaintiff's special permit application was approved.

building and Defendants' building, (b) distances between Plaintiff's building and an entertainment destination called Max's Country Golf, (c) general, unspecified traffic concerns, and (d) impact on Defendants' sales.

55.    The Select Board rejected Nature's Remedy's opposition and objections and took no action to address its request that a Host Community Agreement not be issued to Plaintiff for 405 Middlesex.

56.    The Select Board negotiated a host community agreement with Plaintiff, which was executed on April 12, 2021 (the "Plaintiff's HCA").

57.    Unbeknownst to anyone at the time Nature's Remedy submitted its objection to the Select Board, private discussions were well underway for Defendant Jushi to acquire Nature's Remedy, which codified illegal incentives to block Plaintiff's project.  Specifically, the M&A Agreement between the Defendants features provisions adding a $15 million payout if Plaintiff was successfully blocked from opening.

58.    Defendant Nature's Remedy's complete 180º turn from its prior endorsement and advocacy for the clustering of the two retail facilities at 420 Middlesex and 405 Middlesex came precisely when Defendants were seeking to increase their respective valuations. With tens of millions of dollars at stake, Defendants were heavily motivated to conspire to delay and derail the only possible competitor to their monopoly in Tyngsborough.

**Defendants Enter and Execute a Merger and
Membership Interest Purchase Agreement**

59.    On April 16, 2021, four days after Plaintiff's HCA was signed, Defendants entered and executed the M&A Agreement, which called for payment of $65 million ($5 million in cash and $60 million in securities) by Defendant Jushi to Defendant Nature's Remedy's sole stockholder, Sammartino (now Defendant WWF), the executives of which are Defendants Brady, Carr and

Lundberg.

60.     A material part of the M&A Agreement calls for upwards of $15 million in additional consideration to be paid to the sellers so long as no "Tyngsborough Competitor" opened a "Competing Tyngsborough Dispensary" within either or both of (1) a 2,500 ft. radius from 420 Middlesex or (2) within Tyngsborough (the "Antitrust Compensation").  The timing of payment of the Antitrust Compensation is tied directly to defined "milestone" periods running from the April 16, 2021 execution of the M&A Agreement to two and one half years later (the "Monopoly Period").

61.     Upon information and belief, to date approximately $9,722,226 of Antitrust Consideration ($6,666,668 in common stock and in $3,055,558 in cash) has been realized and paid per the M&A Agreement with an additional $5,277,782 of Antitrust Consideration ($3,333,336 in common stock and $1,944,446 in cash) expected to be paid out over the next seven and a half months.

62.     The purpose of the Antitrust Compensation was to incentivize Defendants' collusive desire to prevent Plaintiff from opening its dispensary at 405 Middlesex and to further prevent Plaintiff from seeking an alternate site within Tyngsborough.

63.     At the time the M&A Agreement was executed, Defendants knew that Plaintiff was the only possible "Tyngsborough Competitor" and Defendants would take steps to make sure that Plaintiff would remain so for the full Monopoly Period.

64.     Beginning at or about the time Defendants entered into negotiations over the M&A Agreement, Defendants have been committed to delaying, frustrating and attempting to derail Plaintiff's retail facility from opening through and beyond the Monopoly Period.

### Plaintiff Obtains Planning's Special Permit and Site Plan Approval Over Defendants' Sham Objections and Opposition

65.     On or about July 6, 2021, Plaintiff applied for site plan and special permit approval to construct an adult use retail marijuana establishment pursuant to Sections 1.16.14, 5.40.01 and

5.60.00 of the Zoning Bylaw.

66.     The Planning Board held hearings regarding Plaintiff's application on August 5, September 16, and October 7, 2021, and received materials and public comment from Plaintiff and its team, the various departments of the Town, peer review consultants, and Plaintiffs' representatives. The only comments, written or oral, in opposition to Plaintiff's application from any resident or business entity in Tyngsborough consisted of Defendants' intentionally frivolous and sham objections.

67.     At the August 5, 2021 Planning Board hearing, Defendants' opposition to Plaintiff's special permit was limited to (1) asserting the need to assure a 500-foot distance between Plaintiff's retail structure and both Defendants' retail structure and Max's Country Golf (a facility Defendants have no relationship to and claim is an outdoor recreational facility "for children") and (2) challenging Plaintiff's standing to seek a special permit without demonstrating authorization of the site's title owner.  Plaintiff readily addressed both issues. Contrary to Defendants' misleading and false assertions in its Zoning Appeal in the Massachusetts Superior Court, at no time did Defendants call into question any traffic impact or any need for a traffic study.

68.     Faced with the Planning Board's inevitable approval of Plaintiff's special permit application, Defendants attempted to further frustrate and cloud the process by arguing that the Planning Board could not issue a permit approval prior to the ZBA review and granting of relief to Plaintiff concerning the dimensions of the site.

69.     Defendants' contention that the Planning Board could not approve a special permit that was expressly conditioned on Plaintiff also obtaining a favorable decision from the ZBA was objectively wrong and frivolous, a position the Town's counsel affirmed at the Planning Board's September 16, 2021 hearing. In fact, Defendants' own special permit had also been granted with an express condition requiring subsequent approval by another body.

15

70.     Defendants again raised this canard at the Planning Board's final hearing on October 7, 2021, arguing against approval of Plaintiff's special permit.  The Planning Board once again considered and dismissed Defendants' argument, noting that the Planning Board had imposed similar conditions in many prior decisions, and voted unanimously to approve Plaintiff's special permit.

### Plaintiff Obtains the ZBA's Favorable Zoning Determination
### Over Defendant's Sham Objections and Opposition

71.     The Planning Board's approval of Plaintiff's special permit required that Plaintiff apply to the ZBA for appropriate relief or "a determination" concerning the non-conforming nature of the lot at 405 Middlesex under Section 2.15.20 of the Zoning Bylaw.

72.     Plaintiff had previously filed an application for a variance from the minimum lot size requirement with the ZBA, which held a public hearing on September 9, 2021.

73.     True to form, Defendants submitted a memorandum opposing Plaintiff's pending variance application.  Among other sham arguments, Defendants reprised their bogus objection that Plaintiff's proposed structure failed to meet the 500-foot buffer requirements, and, without any evidence or support, claimed for the first time that Plaintiff's location would present a traffic hazard, an issue Defendants failed to raise in front of the Planning Board and was entirely unrelated to any issue under the ZBA's consideration.

74.     Defendants' written objection to the ZBA blatantly and falsely asserted that "Nature's Remedy carefully chose its location based upon the idea that having two dispensary locations next to one another would hurt the economic viability of both locations." Exactly the opposite was true. Nature's Remedy had agreed to and accepted the Town's plan to cluster the two retail establishments and specifically benefited from their endorsement of the Town's plan.

75.     Based on guidance provided by the Town and its counsel that a variance was more relief than required to proceed with the project, Plaintiff withdrew its variance application and sought

a zoning determination, upon which the ZBA held a public hearing on October 14, 2021.

76.     At the hearing, the ZBA took evidence from Plaintiff's team and Town departments. Not surprisingly, the only comments from the public were again from Defendants, which had waited to submit a written opposition memorandum to the ZBA until the morning of the hearing and raised numerous frivolous and sham objections about lot size and the 500' distance requirement. Defendants did not, however, argue any negative traffic impact to their site.

77.     Of course, all the while Defendants' true motives behind their frivolous and sham objections to Plaintiff's land use applications had nothing to do with buffer zones or traffic but were rooted in the incentive to earn the undisclosed Antitrust Compensation during the Monopoly Period that could only come by frustrating, delaying or defeating Plaintiff's project.

78.     No meritorious basis existed for any of Defendants' objections.  Defendants presented sham arguments interposed merely for the effect they would have on Plaintiff's permitting process, attempting to frustrate and prevent Plaintiff obtaining favorable approval from the ZBA.

79.     Defendants had no genuine expectation that Plaintiff's land use relief would be denied based on any of the arguments made in their submissions. In fact, the ZBA voted unanimously to grant Plaintiff's application and found that a change of the non-conforming use at 405 Middlesex for Plaintiff's proposed project was not "substantially more detrimental or injurious to the neighborhood than the existing non-conforming structure or use."

80.     Not one of the frivolous and sham arguments Defendants made against Plaintiff's application was credited by any member of the ZBA.

### Plaintiff Applies for Conservation Commission Approval Because of Defendants' Persistent Efforts to Frustrate Plaintiff's Development Project

81.     Based on Defendants' disingenuous efforts to stymie Plaintiff's progress before the Planning Board and ZBA, and after consultation with and direction from Town officials, Plaintiff

decided to seek Conservation Commission approval for its stormwater management plan for its proposed project at the 405 Middlesex site.  Plaintiff's purpose in doing so was to close off any additional opportunities for Defendants to challenge Plaintiff's development plans by asserting Plaintiff had failed to obtain all the local land use approvals required.

82.     While a majority of the members of the Conservation Commission believed that review was not required, a belief Plaintiff had shared prior to Defendants' persistent anti-competitive behavior, the Commission nevertheless granted Plaintiff approval on or about January 11, 2022.

83.     The additional time and expense Plaintiff incurred in going through the Conservation Commission review process was caused by Defendants' repeated and frivolous opposition to Plaintiff's project.

84.     By the time Plaintiff appeared before the Conservation Commission, Defendants had already opposed Plaintiff's land use permit applications before the Select Board, ZBA and Planning Board and had filed their frivolous Zoning Appeal in the Massachusetts Superior Court.

### Defendants File Sham and Frivolous State Case, Appealing Planning and ZBA Decisions Granting Plaintiff Approval for its Project

85.     On or about November 9, 2021, Defendants filed the Zoning Appeal in the Massachusetts Superior Court challenging the decisions of both the Planning Board and ZBA.

86.     While Defendants claim they are aggrieved by the Planning Board and ZBA decisions and are "parties in interest", Defendants' allegations concerning any plausible and particularized harm are objectively frivolous.

87.     Defendants Jushi and Valiant (the two named plaintiffs in the Zoning Appeal) are not abutters to Plaintiff's 405 Middlesex site.  Thus, they do not benefit from any presumption of legal standing under Mass. Gen. Laws c. 40A.

88.     Defendants have claimed aggrievement and standing based on three allegations: (a)

traffic impacts from Plaintiff's facility will negatively impact Defendants' retail facility; (b) Plaintiff's building is only just beyond the 500-foot buffer from Defendants' retail facility, which Defendants claim may prevent them from making future expansions; and (3) Plaintiff did not sufficiently demonstrate its building is more than 500 feet from Max's Country Golf. None of these claims has any factual or legal merit.

89.     At the time they filed the Zoning Appeal, Defendants had not engaged any traffic engineer to verify their bald allegations of substantial traffic-related harm and, therefore, Plaintiff's allegations were unsupported by any evidence or good ground when filed.

90.     When Defendants finally did engage a traffic engineer, nearly a year later, the objective data their expert generated demonstrates that any effect on traffic from Plaintiff's facility would be barely perceptible to the most discerning driver.  The data shows that the maximum impact at the peak hour amounts to an increase to vehicle queueing of <u>less than one vehicle</u> and increased turning delays by <u>fractions of seconds</u> for most movements and, only in the case of a turning movement to exit the Jushi parking lot onto Middlesex Road, a delay increase of less than 10 seconds.

91.     Notwithstanding their Zoning Appeal, Defendants acknowledge that Plaintiff's facility <u>complies</u> with the 500-foot buffer zone requirement and have further admitted they have no plans, never mind approved permit applications to expand their facilities.  Thus, their claims of harm arising out of the placement of Plaintiff's facility just outside the 500-foot buffer are entirely irrelevant, pretended, speculative, particularly specious and insubstantial; failing to amount to any cognizable zoning-related injury.

92.     As for Defendants' claims that Plaintiff failed to show its facility is located more than 500 feet from Max's Country Golf — a facility in which Defendants have no interest —Defendants have cited no evidence.  The undisputed fact is that Plaintiff submitted a stamped and certified plan of its engineer showing a calculation that places the Max's Country Golf more than 527 feet away

from Plaintiff's location.

93.     Beyond lacking standing for their appeals, Defendants' arguments are baseless and unsupported on the merits.  Both the Planning Board and ZBA decisions rested on well-reasoned and considered discretionary determinations that Defendants, presenting no colorable argument in the Zoning Appeal, have failed to demonstrate are unreasonable, arbitrary or capricious.

94.     Defendants have no prospect of making any such demonstration; Defendants' only prospect was (and remains) the perpetuation of its monopoly and the earning of the Antitrust Compensation.

### Planning Approves Special Permit for a Massive Distribution Facility of Which Defendants Are an Important Part

95.     In the months leading up to June 2022, during the pendency of the Zoning Appeal and months prior to Defendants' release of their incredulous traffic impact study, Defendants surreptitiously worked with the developers of a 492,750 sq. ft. distribution facility to be located at 406 & 424 Middlesex Road (the "Distribution Facility"), a site immediately abutting Defendants' 420 Middlesex facility and directly across from Plaintiff's permitted facility at 405 Middlesex.

96.     The Planning Board held public hearings regarding the Distribution Facility on June 16, July 21, August 18, 2022, and, at a final hearing on September 1, 2022, granted a special permit for the Distribution Facility.

97.     Defendants have not appealed that special permit.

98.     Defendants, who were informed about the Distribution Facility's plans, were also aware that the Distribution Facility's submittals to the Planning Board included a transportation study by Howard Stein Hudson engineers (the "HSH Traffic Study").

99.     The HSH Traffic Study projected that the Distribution Facility would generate approximately 3500 vehicle trips per day using a driveway immediately adjacent to Defendants'

facility parking lot to access the Distribution Facility site.

100.    The HSH Traffic Study also took into account Plaintiff's 405 Middlesex facility being fully operational alongside Defendants' 420 Middlesex facility and concluded that the addition of the Distribution Facility among both Plaintiff's and Defendants' existing operations would have only minimal impacts on traffic in the area.

101.    Further, the Distribution Facility's submittals and HSH Traffic Study included fully engineered plans showing significant infrastructure improvements, including signalization of the Distribution Facility driveway, the Jushi site entry and Plaintiff's site entry — all of which would moot any traffic concerns Defendants conceivably could raise.

102.    The HSH Traffic Study further shows that the Distribution Facility intended to provide Jushi with additional parking, an expansion of Jushi's facilities that does not encroach upon the established 500-foot buffer with Plaintiff's retail building, further invalidating Defendant's bogus arguments in the Zoning Appeal.

103.    The fact that these submittals were made after extensive planning and required Defendants' awareness, acquiescence and quite possibly active and significant involvement, demonstrates that Defendants knew throughout the filing and pendency of the Zoning Appeal in the Massachusetts Superior Court that Plaintiff's retail facility imposed no genuine traffic impacts and, in any event, the entire traffic pattern for accessing Defendants' site was going to be changed, eliminating any semblance or basis that could have conceivably existed for purported aggrievement.

104.    Given their persistent and brazen anticompetitive behavior and wanton violation of federal and state laws, it came as no surprise that Defendants failed to mention any of these facts in any of their pleadings or papers filed with the Massachusetts Superior Court.

105.    Defendants have leveled a host of objections at every conceivable step in the planning and development process to block Plaintiff from opening a retail store at 405 Middlesex.

106.     Armed with information that each of their objections was fallacious and certain to lose in front of the relevant tribunal, Defendants persisted in their illegal attempt to block competition in the marketplace, damage consumers, and effectively steal tax revenue from the Town and Commonwealth.

107.     In their ultimate act, Defendants filed the Zoning Appeal, misled the Massachusetts Superior Court, and presented information they knew to be false or materially misleading, all in a calculated and premeditated effort to gain a windfall in the payment of the Antitrust Compensation under the M&A Agreement and reap the benefits of continuing to operate an unlawful monopoly in Tyngsborough.

108.     Defendants plainly and unmistakably have misused and abused the judicial process with no regard for the merits of their appeals simply for the purpose of obtaining financial and contractual benefits of anti-competitive behavior. In so doing, Defendants have violated federal antitrust and state unfair and deceptive business practices laws, as outlined below.

### COUNT I
### <u>Violation of 15 U.S.C. §1; Conspiracy to Restrain Trade</u>
### (Against all Defendants)

109.     The allegations of all preceding paragraphs above are incorporated as though fully set forth herein.

110.     Plaintiff's and Defendants' stores are direct competitors in the adult use retail marijuana market in the northern Massachusetts and greater Merrimack Valley region.

111.     Defendants entered into an agreement or arrangement to hinder, impede, delay, obstruct and/or prevent Plaintiff's attempts to secure approvals and develop Plaintiff's retail store at 405 Middlesex that would compete with Defendants' store at 420 Middlesex.

112.     This unlawful agreement or arrangement has the effect of limiting competition in

the Tyngsborough, northern Massachusetts and greater Merrimack Valley markets for goods and services that Plaintiff and Defendants sell.

113.     The result of this unlawful agreement or arrangement is that Defendants were enabled to restrain trade, control prices, and maintain a monopoly within the Tyngsborough, northern Massachusetts and greater Merrimack Valley markets.  It has also insulated Defendants from competing by preventing the offering of new, diverse, and higher quality goods and services to the detriment of consumers in the marketplace.

114.     Defendants' conduct violates the Sherman Act, 15 U.S.C. § 1.  Through an agreement or arrangement to hinder, impede, delay, obstruct and/or prevent Plaintiff from obtaining final, non-appealable land use approvals, Defendants conspired to restrain trade and commerce.

115.     Defendants conspired together to frustrate, delay and hinder Plaintiff's permitting process and Jushi and Valiant agreed jointly to object to Plaintiff's applications before the Planning Board and ZBA.

116.     Defendants Jushi and Valiant even agreed to share the services of their legal counsel to facilitate their opposition to Plaintiff's applications and entered a joint appearance and raised joint objections to Plaintiff's permit applications in the Massachusetts Superior Court for the past two years in an effort to hinder, impede, delay, obstruct and/or prevent Plaintiff from obtaining final, non-appealable land use approvals.

117.     Defendant Valiant, despite not being a direct participant in the market for goods and services that both Jushi and Plaintiff sell, has not presented argument through or by any of its own representatives during any proceedings before the Planning Board and ZBA, but instead has relied on and attempted to bolster the positions that Defendant Jushi – a direct market competitor to Plaintiff – has made in an effort to hinder, impede, delay, obstruct and/or prevent Plaintiff from

obtaining final, non-appealable land use approvals.

118.    Furthermore, as is evident from the M&A Agreement, the remaining Defendants in this action shared in Defendants Jushi and Valiant's purpose and design expressed through their written and verbal objections before the Select Board, Planning Board and ZBA and in the Zoning Appeal filed in the Middlesex Superior Court.

119.    Upon information and belief, Defendants coordinated their efforts in preparing, advancing and now in prosecuting their objectively baseless complaints and oppositions before the Planning Board and ZBA, including, without limitation, working cooperatively on correspondence, talking points, plans and sketches, pleadings, briefs, motions and other documents submitted to the Planning Board, ZBA, other offices and officials and to the Massachusetts Superior Court in an effort to hinder, impede, delay, obstruct and/or prevent Plaintiff from obtaining final, non-appealable land use approvals.

120.    By improperly and illegally hindering, impeding, delaying, obstructing, and/or preventing Plaintiff from promptly obtaining all necessary governmental approvals for the development of the proposed establishment though the institution and maintenance of unreasonable legal proceedings, Defendants restrained trade and prevented competition in the market for the goods and services Defendants and Plaintiff sell in the Tyngsborough, northern Massachusetts and greater Merrimack Valley area and have maintained a monopoly hold and/or market power therein. This has resulted in anticompetitive effects throughout the relevant market, including higher prices, constrained services, and less choices for consumers.

121.    Shoppers in the retail marijuana market have been injured and will continue to be injured by the absence of competition in the market through higher prices and more limited/lower-quality services than would otherwise have been available had Defendants not illegally and

unlawfully conspired to hinder, impede, delay, obstruct and/or prevent Plaintiff from obtaining final, non-appealable land use approvals.

122.    Plaintiff has suffered and will continue to suffer antitrust injury in an amount to be proven at trial. These damages shall include the consequences of Defendants' efforts to hinder, impede, delay, obstruct, and/or prevent Plaintiff from promptly obtaining all necessary governmental approvals for the construction of the proposed establishment and thereby hindering, impeding, delaying, obstructing, and/or preventing Plaintiff realizing the financial benefits of operating its establishment at 405 Middlesex while forcing Plaintiff to, at the same time, continue to pay money in connection with 405 Middlesex and expending substantial amounts to defend the approvals from the series of sham petitions and appeals, thereby depleting Plaintiff's goodwill with the Town and harming its relationships with its vendors, and investors, and putting Plaintiff's HCA in jeopardy while rendering it unable to develop the 405 Middlesex.

123.    Plaintiffs' damages may also include legal and equitable remedies to disgorge the ill-gotten Antitrust Compensation paid under the M&A Agreement and the unfair market benefits Defendants have reaped through their wrongful and illegal anticompetitive conduct.

124.    As a further result of the unlawful acts perpetrated by Defendants they have hindered, impeded and otherwise engaged in conduct that is anticompetitive and has otherwise interfered with and impeded competition.

**Count II**
**Violation of 15 U.S.C. §2; Monopolization, Attempted Monopolization,**
**<u>and Conspiracy to Monopolize</u>**
**(Against All Defendants)**

125.    The allegations of all preceding paragraphs above are incorporated as though fully set forth herein.

126.     Defendants' conduct, as alleged above, violates the Sherman Act, 15 U.S.C. § 2. Through the institution and perpetuation of sham objections and litigation, including the initiation of a series of petitions, objections, oppositions and Massachusetts Superior Court actions, Defendants' have engaged in predatory and/or uncompetitive conduct with the specific intent to gain or maintain power to monopolize part of interstate commerce and trade.

127.     When Defendants filed their Zoning Appeal, filed various oppositions and objections, and attempted to frustrate Plaintiff's permitting process, they knew or should have known that there was no legitimate basis in pursuing these challenges, they were objectively baseless, and were filed for the purpose of delaying the permitting and development of Plaintiff's establishment.

128.     These same actions, objections and oppositions were also objectively baseless because the claims alleged in those actions were merely an attempt by Defendants, with the aid of others, to interfere with Plaintiff's attempt to obtain the land use approvals necessary to construct and operate the proposed establishment at the 405 Middlesex.

129.     When Defendants brought their action and filed their objections and oppositions, they knew or should have known that there was no legitimate basis in pursuing these challenges, they were filed without regard to their merit, and were filed for the purpose of using the governmental process, as opposed to the outcome of that process, to harm Plaintiff and to restrain trade.

130.     In fact, in the express terms of the M&A Agreement, Defendants documented their unlawful, anticompetitive plan to prevent Plaintiff from entering the marketplace and incentivized that conduct through the promise of $15 million in additional compensation contingent on efforts to obstruct Plaintiff's plans.

131.    By pursuing these unfounded claims, Defendants intended to preserve monopoly power in Tyngsborough, northern Massachusetts and greater Merrimack Valley for full adult use retail marijuana establishments with help and assistance of their counsel and/or other persons or entities and to obtain additional compensation promised them if they were successful in preventing their only market competitor from opening.

132.    By preventing Plaintiff's establishment from proceeding to development and operations, Defendants are excluding their only competitor in Tyngsborough, resulting in the fact that Defendants have preserved monopolistic power. They have admitted their position during the aforesaid appeals that the only participant in the subject market permitted in Tyngsborough is Defendants' establishment.

133.    Defendants intentionally and willfully conspired with each other and other currently unknown persons and entities to monopolize the adult use recreational marijuana market by way of the acts set forth above, including, but not limited to developing a strategy with those other persons and entities to maintain monopoly power in the market through maintenance of sham objections and litigations, as well as other anti-competitive acts, and to stall and delay the administrative and judicial processes.

134.    A substantial amount of commerce has been affected by Defendants' actions. Shoppers in the relevant market in the Tyngsborough, northern Massachusetts and greater Merrimack Valley area have been injured and will continue to be injured by the absence of competition in the market through higher prices and more limited/lower-quality services than would otherwise be available had Defendants not attempted to maintain monopoly power, and had Defendants not conspired to hinder, impede, delay, obstruct and/or prevent Plaintiff from obtaining final, non-appealable land use approvals.

135.     As a result of the unlawful acts perpetrated by Defendants, Plaintiff has suffered and will continue to suffer antitrust injury in an amount to be proven at trial, including hindering, impeding, delaying, obstructing, and/or preventing Plaintiff from promptly obtaining all necessary governmental approvals for the construction of the proposed establishment and thereby hindering, impeding, delaying, obstructing, and/or preventing Plaintiff from realizing the financial benefits of operating its proposed establishment at 405 Middlesex while forcing Plaintiff to, at the same time, continue to pay money in connection with 405 Middlesex and expending substantial amounts to defend the approvals from the series of sham petitions and appeals, thereby depleting Plaintiff's goodwill with the Town and harming its relationships with its vendors, and investors, and putting Plaintiff's HCA in jeopardy while rendering it unable to develop the 405 Middlesex.

### Count III
### Unfair Competition Under G.L. c. 93A
(Against All Defendants)

136.     The allegations of all preceding paragraphs above are incorporated as though fully set forth herein.

137.     At all relevant times hereto, Defendants were engaged in trade or commerce as defined under Mass. Gen. Laws ch. 93A, § 1(b).

138.     Defendants have and continue to employ unfair methods of competition and unfair and deceptive acts or practices in the conduct of their business, thereby injuring and damaging Plaintiff.   These acts and practices have and are occurring primarily and substantially in Massachusetts.

139.     Defendants' violations of Mass. Gen. Laws ch. 93A, § 2 were and continue to be willful and/or knowing violations of said statute. Defendants are therefore liable, under Mass. Gen. Laws ch. 93A, §§ 2, 4 and 11, to Plaintiff in an amount equal to not less than twice and up to three

times Plaintiff's damages by reason of its violations of Mass. Gen. Laws ch. 93A, § 2.

140.    Defendants' conduct in violation of G.L. c. 93A was and is intentional, knowing and willful and undertaken in bad faith.

141.    Defendants' conduct has and continues to result in the loss of money or property in an amount to be determined at trial, but in excess of the jurisdictional amount of this Court.

**Count IV**
**Violation of Massachusetts Antitrust Act**
**(Against All Defendants)**

142.    The allegations of all preceding paragraphs above are incorporated as though fully set forth herein.

143.    Defendants' conduct pleaded in the foregoing allegations of this Zoning Appeal had and continues to have their anticompetitive impact primarily in Massachusetts.

144.    Defendants' unlawful conduct violated and continues to violate the Massachusetts Antitrust Act, G.L. c. 93, §§1-14A.

145.    As a direct result of such unlawful conduct, Plaintiff has and continues to suffer financial damage and harm in an amount to be determined at trial, but in excess of the jurisdictional amount of this Court.

**Count V**
**Interference with Advantageous Contractual and Business Relations**
**(Against All Defendants)**

146.    The allegations of all preceding paragraphs above are incorporated as though fully set forth herein.

147.    Defendants knew or should have known that Plaintiff negotiated and had obtained a Host Community Agreement with the Town and had entered into an agreement for use and

occupancy or to lease the property at 405 Middlesex.

148.     Defendants' conduct, including, without limitation, their efforts to hinder, impede, delay, obstruct and/or prevent Plaintiff from obtaining necessary governmental approvals for the development of their facility interfered with Plaintiff's contractual and advantageous business relations with the Town and with the owner of the 405 Middlesex property.

149.     Defendants' conduct was willful and intentional and was undertaken by improper means and with an improper purpose, including, without limitation, unlawfully and improperly to prevent with sham and frivolous oppositions, objections and litigation Plaintiff from entering the market as a market competitor and/or maintain a monopoly.

150.     Defendants' unlawful actions caused injury, damage and harm to Plaintiff and Plaintiff has suffered damages as a result of such interference in an amount to be determined at trial, but in excess of the jurisdictional amount of this Court.

## Count VI
## <u>Malicious Use of Process</u>
### (Against All Defendants)

151.     The allegations of all preceding paragraphs above are incorporated as though fully set forth herein.

152.     Defendants objected to Plaintiff's land use applications and filed suit to challenge land use approvals issued to Plaintiff by Planning and ZBA.

153.     Defendants lacked probable cause or sound legal or factual basis to object to Plaintiff's land use applications and/or to institute legal challenges to the decisions of the Planning Board and ZBA because they did not have a reasonable belief that there was a good chance of establishing some or all of its claims seeking denials of Plaintiff's applications by those bodies or reversal of the decisions of those bodies.

154.     Defendants made their objections to, and filed its challenges to, the land use approvals issued to Plaintiff by Planning and ZBA to impede Plaintiff's ability to develop the 405 Middlesex property and build its establishment without regard for whether the facts and circumstances warranted legal challenge or such opposition.

155.     In fact, Defendants entered into contractual agreements to provide $15 million in additional compensation if successful in preventing Plaintiff from opening its facility at 405 Middlesex or anywhere else in Tyngsborough.  Defendants anticompetitive contractual incentives were negotiated and executed before Plaintiff even had submitted any application for land use approval to any board in Tyngsborough, thus, Defendants had committed themselves to an anticompetitive course of action without regard to any of the merits of Plaintiff's Planning Board or ZBA applications.

156.     Defendants' actions were motivated by their malicious desire to illegally and improperly maintain monopoly power in Tyngsborough for the goods and services Jushi and Plaintiff sell and to reap an additional $15 million in Antitrust Compensation.

157.     Through the course of conduct Defendants adopted to hinder, impede, delay, obstruct and/or prevent Plaintiff's attempts to secure land use approvals to develop the 405 Middlesex property with Plaintiff's establishment that would compete with Jushi's establishment, Plaintiff has been and continues to be denied meaningful access to the land use approval process and ultimately, the ability to engage in competition in the market.  This interference with Plaintiff's rights constitutes a special grievance.

158.     Planning and ZBA rejected Defendants' objections.  The subsequent litigation Defendants filed is frivolous and baseless.

159.     Defendants' unlawful abuse of process has caused Plaintiff injury and damage in

an amount to be determined at trial, but that is in excess of the jurisdictional amount of this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that this Court enter judgment and grant relief against Defendants jointly and severally as follows:

A. An award of compensatory, exemplary, incidental, consequential and other damages in in the minimum amount of $60 million or such other amount to be determined at trial;

B. A finding that Defendants violated Sections 1 and 2 of the Sherman Act, and awarding treble damages under 15 U.S.C. §15;

C. A finding that Defendants violated G.L. c. 93A, §§ 2, 4 and 11 and awarding treble damages pursuant to the statute;

D. A finding that Defendants violated the Massachusetts Antitrust Act, G.L. c. 93, §§1-14A, and awarding treble damages and other appropriate relief under the statute;

E. A finding that Defendants tortiously interfered with Plaintiff's contractual and advantageous relations and awarding appropriate damages and relief;

F. A finding that Defendants maliciously abused process and awarding appropriate damages and relief;

G. Disgorgement of the amounts Defendant Nature's Remedy and any other affiliated persons or entities realized as Antitrust Compensation through the M&A Agreement.

H. A finding that Plaintiff is entitled to recover its costs, expenses and attorneys' fees in connection with this action;

I. A permanent injunction enjoining Defendants and anyone acting in concert with them from monopolizing or attempting to monopolize the Tyngsborough market or otherwise engage in unfair and deceptive practices in restraint of trade; and

J. Such further and additional relief the Court deems just and proper under the

circumstances.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all counts so triable.

Dated: March 31, 2023

Respectfully submitted,

**Plaintiff**
**MJ's Market, Inc.**

By its attorneys,

/s/Michael J. Duffy
Michael J. Duffy, BBO #652621
**TYMANN, DAVIS & DUFFY, LLP**
One Boston Place, Suite 2600
Boston, MA  02108
617.933.9490
mduffy@tddlegal.com

/s/Abhijit Das
Abhijit "Beej" Das, BBO #647673
**TROCA GLOBAL ADVISORS LLC**
Ten Post Office Square, Suite 800
Boston, MA  02109
617.231.6551
adas@trocaglobal.com