**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| |
|---|
| MJ's MARKET, INC., |
|     Plaintiff, |
|     v. |
| JUSHI HOLDINGS, INC., JUSHI MA, INC., JUSHI, INC., SAMMARTINO INVESTMENTS LLC, NATURE'S REMEDY OF MASSACHUSETTS, INC., WWF LLC, MCMANN LLC, VALIANT ENTERPRISES, LLC, JOHN BRADY, ROBERT CARR, JR., and JUSTIN LUNDBERG, |
|     Defendants. |

4:23-CV-40037-MRG

**GUZMAN, D.J.**

**<u>MEMORANDUM & ORDER</u>**

I.    <u>Introduction</u>

    This is an antitrust case. Plaintiff MJ's Market has brought this action in the wake of Defendants'[1] allegedly anticompetitive and tortious conduct. This Memorandum and Order provides the Court's findings and reasoning for its decision to **<u>DENY</u>** the Jushi Defendants' motion

---

[1] Jushi Holdings, Inc., Jushi, Inc., Jushi MA, Inc., Nature's Remedy, (collectively, the "Jushi Defendants"), and Sammartino, WWF, and three Sammartino / WWF executives: Mr. John Brady, Mr. Robert Carr, Jr., and Mr. Justin Lundberg (collectively, the "Sammartino Defendants"). The two remaining Defendants, (McCann LLC ("McCann") and Valiant Enterprises, LLC ("Valiant")), did not move to dismiss the case against them.

to dismiss [ECF No. 46] and to **DENY** the Sammartino Defendants' motion to dismiss [ECF No. 45].

## II.    Background

### A.    The Facts[2]

#### i.    Tyngsborough Opens its Doors to Licensed Marijuana Businesses

The roots of this dispute were planted in May 2018. At a town meeting held that month, the town of Tynsborough amended its Zoning Bylaw (the "Zoning Bylaw") to provide for the establishment of licensed marijuana businesses. [ECF No. 1 at 8]. Among other things, the Zoning Bylaw amendment provided that these businesses would be allowed to operate only within the so-called Business 3 District (the "B3 District") by means of a special permit. [Id.]

The B3 District is a three-plus mile "stretch" along both sides of Middlesex Road. [ECF No. 1 at 9]. One area of the B3 District is near the New Hampshire border and is also close to a shopping center and other retail business centers. [Id.] After passing the amendment to the Zoning Bylaw, the town of Tynsborough created an adult use marijuana sub-committee of its Planning Board (the "Sub-Committee") that was charged with "review[ing] and recommend[ing] marijuana retail businesses as finalists" with whom "Host Community Agreements" could be negotiated, as well as determining "the most appropriate and advantageous locations" for the selected marijuana businesses. [Id.]

In time, the Sub-Committee revealed that the town would feature *two* licensed marijuana establishments and that the Sub-Committee favored placing both of the selected businesses in an

---

[2] Because this case is presently before this Court on a motion to dismiss, the Court sets forth the facts taking as true all well-pleaded allegations in the complaint and drawing all reasonable inferences in MJ's Market's favor. See Morales-Tañon v. P.R. Elec. Power Auth., 524 F.3d 15, 17 (1st Cir. 2008).

"area within the B3 District located away from the inner sections of the Town and as close to the border with New Hampshire as possible." [Id.] Plaintiff avers that acknowledgement of -- and agreement to -- this clustering was a precondition of favorable treatment of an application for one of the two licenses. [Id.]

### ii.  The Select Board Makes Its Decisions

On September 24, 2018, the town's Select Board held a hearing to help decide both the most advantageous locations for these licensed marijuana establishments, as well as the two applicant businesses with which the town would enter Host Community Agreement negotiations. [Id.] Plaintiff states that during this meeting, the police chief expressed the town's strong preference for having the two selected businesses be near one another, which would allow for close law enforcement monitoring. [Id at 9-10].

At this near-final stage, there were three applicant businesses vying for a chance to enter negotiations for the two slots: (1) Plaintiff; (2) Defendant Nature's Remedy, and (3) non-party Royalty Group ("Royalty").  Following the September 24, 2018, hearing, the Select Board voted in favor of entering into Host Community Agreements with Defendant Nature's Remedy and with Royalty. [Id at 10]. Thus, Plaintiff was not selected.  In Plaintiff's telling, Defendant Nature's Remedy's purportedly strong commitment to a tight, "two-site cluster" arrangement was a "material reason" for their success in the process since the Select Board ultimately voted in favor of an arrangement that would have placed Defendant Nature's Remedy at 420 Middlesex Road and Royalty close by at 405-409 Middlesex Road. [Id.] Plaintiff's proposed (and, unselected) location, on the other hand, was further away "at the opposite end of the B3 District." [Id.]

### iii. <u>Defendant Nature's Remedy Obtains its License; Royalty Drops Out; Creating an Opening that Plaintiff Fills</u>

Following their execution of the Host Community Agreements with the town, Defendant Nature's Remedy and Royalty entered the permitting and development phase. [<u>Id</u> at 11]. Defendant Nature's Remedy was successful in this process and ultimately obtained its license to operate from the Commonwealth's Cannabis Control Commission.  [<u>Id.</u>]  The town held three public hearings on Defendant Nature's Remedy's special permit application.  [<u>Id.</u>]  Plaintiff highlights that, during its permitting and development process, Defendant Nature's Remedy "saw no issue seeking and obtaining Planning Board approval for its site prior to receiving other necessary approvals identified as required in the Zoning Bylaw," and that, in particular, it was not required to, nor did it conduct any traffic analysis or impact studies.  [<u>Id</u> at 11-12]. On December 6, 2018, the Town issued Defendant Nature's Remedy its special permit. [<u>Id.</u>]

Royalty, on the other hand, did not complete the necessary permitting and development process before its Host Community Agreement expired.  [<u>Id</u> at 10-11]. This created a vacancy, causing the town to re-open the application process. [<u>Id.</u>] Plaintiff submitted a new application -- this time for the location that Royalty had sought and failed to inhabit (i.e., 405-409 Middlesex Road). [<u>Id.</u>] On that score, Plaintiff alleges that its willingness to "revise its plans, abandon its former site, and relocate" relied "in material part" on Defendant Nature's Remedy's purported "acceptance and endorsement" of the two-site cluster arrangement.  [<u>Id</u> at 11]. On March 21, 2021, the Select Board voted in favor of entering into a Host Community Agreement with Plaintiff. [<u>Id</u> at 12].

### iv. <u>Defendant Nature's Remedy Objects to the Town's Issuance of a Host Community Agreement to Plaintiff; the Town Overrules the Objections</u>

After the Town voted to enter into a Host Community Agreement with Plaintiff, Defendant Nature's Remedy filed objections to prevent it the agreement from being executed. [<u>Id</u> at 12-13]. Specifically, Defendant Nature's Remedy raised objections relating to: (1) the distances between Plaintiff's proposed site and its site; (2) the distances between Plaintiff's site and an entertainment destination operated by non-party Max's Country Golf; (3) general, unspecified traffic concerns, and (4) the impact on its sales. [<u>Id.</u>] The Town executed the Host Community Agreement with Plaintiff over these objections on April 12, 2021. [<u>Id</u> at 13].

### v. <u>The Defendants Enter Into a "Merger and Membership Interests Purchase Agreement"</u>

Four days after the Town executed its Host Community Agreement with Plaintiff for the second of two marijuana retailer spots, Defendant Nature's Remedy was implicated in a corporate agreement that would later serve to ignite many of Plaintiff's claims in this case. [<u>Id.</u> at 13-14].

On April 16, 2021, the Defendants entered into a "Merger and Membership Interests Purchase Agreement" (the "Defendants' Corporate Agreement") [<u>Id.</u>] The net result of the Defendants' Corporate Agreement was that three entities (i.e., Defendant Jushi Holdings, Inc., Defendant Jushi, Inc., and Defendant Jushi MA, Inc.) took ownership of (1) Defendant Nature's Remedy, (2) Defendant McCann LLC ("McCann"), and Defendant Valiant Enterprises, LLC ("Valiant"). [<u>See Id.</u>] The Jushi Defendants took ownership of these entities *from* the Sammartino Defendants (i.e., (1) Defendant Sammartino, (2) Defendant WWF, and three Sammartino / WWF executives: (3) Mr. John Brady, (4) Mr. Robert Carr, Jr., and (5) Mr. Justin Lundberg). [<u>Id.</u>]

The consideration for this transaction included $65,000,000 in the forms of cash, promissory notes, and stock. [ECF No. 1-1 at 7-8]. The Defendants' Corporate Agreement also

contained a section entitled "Additional Merger Consideration" which provided for some contingency-based payouts, including situations in which a "Tyngsborough Competitor" (a defined term) did, or did not, open a "Competing Tyngsborough Dispensary" (another defined term) at certain locations and at certain time intervals within 30 months from Defendants' Corporate Agreement-related transaction closing date. [Id.] Plaintiff notes that, among other things, this section of the Defendants' Corporate Agreement:

> [C]alls for upwards of $15 million in additional consideration to be paid to the sellers so long as no "Tyngsborough Competitor" opened a "Competing Tyngsborough Dispensary" within either or both of (1) a 2,500 ft. radius from 420 Middlesex or (2) within Tyngsborough [].

[ECF No. 1 at 14].

### vi.  Plaintiff Pursues its Special Permit; Only Certain Defendants Object

In July 2021, Plaintiff applied for site plan and special permit approval to construct its retail marijuana establishment. [Id at 14-15]. The Town's Planning Board held three meetings regarding Plaintiff's application. [Id at 15]. The only written or oral comments that were filed in opposition to Plaintiff's application came from counsel for Defendant Nature's Remedy and Defendant Valiant. [Id.]; [ECF No. 18 at 11 (Sammartino Defendants noting that the objections were filed by counsel for these entities)].

The filed objections to Plaintiff's special permit were predicated on: (1) "asserting the need to assure a 500-foot distance between Plaintiff's retail structure" and both Defendant [ Nature's Remedy's building] and [non-party] Max's Country Golf's building . . . and (2) a challeng[e] to Plaintiff's standing to seek a special permit without [first] demonstrating authorization of the site's title owner." [ECF No. 1 at 15]. Plaintiff asserts that there were no objections at this juncture relating to traffic impacts. [Id.] The objecting parties also asserted that the Planning Board could not issue a special permit to Plaintiff prior to the town's Zoning Board of Appeals first reviewing

and granting a variance that Plaintiff needed. [Id. at 15-16]. The town's counsel rejected this Zoning Board of Appeals-related argument at the Planning Board's September 16, 2021, hearing. [Id.] Plaintiffs have observed that Defendant Nature's Remedy special permit had been granted with an express condition that subsequent approval by another body was required. [Id.] Over these objections, the Planning Board voted unanimously to approve Plaintiff's special permit on October 7, 2021. [Id.]

### vii.    Plaintiff Pursues its Required Finding from the Zoning Board of Appeals; Only Certain of the Defendants Object

In the Fall of 2021, Plaintiff pursued its variance application before the Town's Zoning Board of Appeals. [Id. at 16]. This was necessary because the Town's approval of its special permit "required that Plaintiff apply to the ZBA for appropriate relief or a 'determination' concerning the non-conforming nature of the lot at 405 Middlesex" under the Zoning Bylaw. [Id.] Appearing once again, counsel for Defendant Nature's Remedy and Defendant Valiant objected to the proposed variance; arguing among other things that Plaintiff failed to meet a 500-foot buffer requirement and, apparently for the first time, that Plaintiff's location would pose a traffic hazard. [Id.] In their written objection, the parties asserted that "Nature's Remedy carefully chose its location based upon the idea that having two dispensary locations next to one another would hurt the economic viability of both locations." [Id.] At an October 14, 2021, public ZBA hearing on Plaintiff's application, the only objections came from counsel for Defendant Nature's Remedy and Defendant Valiant. [Id. at 17]. Over each of these objections, the ZBA voted unanimously to grant Plaintiff's application. [Id.]

### viii.    Plaintiff Proactively Seeks Conservation Commission Approval

Allegedly because Plaintiff faced a myriad of objections in various fora from certain of the Defendants, Plaintiff consulted with town officials and proactively sought approval from the

7

Town's Conservation Commission regarding its stormwater management plan for the 405-409 Middlesex Road site. [Id at 17-18]. Plaintiff alleges that its "purpose in doing so was to close off any additional opportunities for Defendants to challenge Plaintiff's development plans . . . ." [Id.] Although it does not appear that any of the Defendants opposed Plaintiff in the Conservation Commission forum, going through this approval process cost Plaintiff additional time and expense. [Id. at 18]. The Conservation Commission ultimately granted Plaintiff's application in January 2022. [Id.]

### ix.  Jushi Defendants File State Superior Court Case Challenging Planning Board and ZBA Decisions; Have No Objection to the Entrance of a Large Distribution Facility on Middlesex Road

In November 2021, Defendant Jushi MA, Inc. and Defendant Valiant filed a zoning appeal in the Massachusetts Superior Court (the "Zoning Appeal") challenging the decisions of both the Planning Board and the ZBA. [ECF No. 18-4]. The Court will not wade too deeply into the merits, or the competing arguments being made in the Zoning Appeal, but it notes Plaintiff's positions that the Defendants pursuing the Zoning Appeal lack standing to bring the suit and that, in any event, none of the asserted legal claims have any factual or legal merit. [ECF No. 1 at 19-20].[3]

### B.  Procedural History

In the wake of Plaintiff's Complaint [ECF No. 1], the Jushi Defendants and the Sammartino Defendants filed separate 12(b)(6) motions to dismiss on July 31, 2023. [ECF No. 23]; [ECF No. 17]. Plaintiff filed oppositions to each of these motions. [ECF No. 31]; [ECF No. 32]. This Court held an in-person hearing on the Defendants' motions to dismiss [ECF No. 44] and later denied

---

[3] Notably, data from a traffic study commissioned by the Defendants that are pursuing the Zoning Appeal allegedly concluded that "the maximum impact at the peak hours amounts to an increase to vehicle queueing of less than one vehicle and increased turning delays by fractions of sections for most movements…" [Id.]

both motions to dismiss by electronic orders.  [ECF No. 45]; [ECF No. 46].  This Memorandum and Opinion sets forth the Court's reasoning for having denied both motions to dismiss.

III.    **The Motion to Dismiss Standard**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  At the pleading stage, a plaintiff need not demonstrate that they are likely to prevail, but "[their] claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'" García-Catalán v. United States, 734 F.3d 100, 102-03 (1st Cir. 2013) (quoting Iqbal, 556 U.S. at 678).

When deciding a 12(b)(6) motion to dismiss, a court must "accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012) (citing Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006)).  In determining whether a complaint has cleared the plausibility threshold, courts conduct a two-part, context-specific inquiry.  First, the court must separate "'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" García-Catalán, 734 F.3d at 103 (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Second, the court must determine "whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)).  Conducting this inquiry requires a court to draw on its "judicial experience and common sense." Iqbal, 556 U.S. at 679.

Although the Court's motion to dismiss inquiry is ordinarily limited to the facts alleged in the complaint, incorporated into the complaint, or susceptible to judicial notice, In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 20 (1st Cir. 2003), the Court may consider certain documents the authenticity of which are not disputed by the parties, official public records, documents central to Plaintiff's claim, and documents sufficiently referred to in the complaint. Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993) (collecting cases).

In the antitrust context, there are no special pleading requirements at the motion to dismiss stage. See e.g., Corey v. Look, 641 F.2d 32, 38 (1st Cir. 1981) ("'There is no special rule requiring more factual specificity in antitrust pleadings'") (quoting Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc., 627 F.2d 919, 924 (9th Cir. 1980)). Heavy federal court caseloads and the costs of modern antitrust litigation counsel against sending parties into discovery when there is no reasonable likelihood that Plaintiffs can construct a valid claim. In re Carbon Black Antitrust Litig., No. 03-10191-DPW, 2005 U.S. Dist. LEXIS 660, at *28 (D. Mass. Jan. 18, 2005) (citation omitted). That said, the Supreme Court has observed that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving Plaintiff ample opportunity for discovery should be granted *very sparingly*." Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 746 (1976) (quoting Poller v. Columbia Broad., 368 U.S. 464, 473 (1962) (emphasis added)).

## IV.    **Antitrust Standing**

### A.    **Legal Landscape**

Before the Court may reach the merits of Plaintiff's three antitrust claims (i.e., Counts I, II, and IV) it must first decide whether Plaintiff has antitrust standing -- which is distinct from

constitutional standing.[4]  See e.g., Vázquez-Ramos v. Triple-S Salud, Inc., 55 F.4th 286, 293 (1st Cir. 2022) (explaining that, to bring antitrust claims, "plaintiffs must not only meet the typical requirements of Article III standing but also the requirements of the so-called 'antitrust standing' doctrine." (citation omitted)).  As the First Circuit has explained, the antitrust standing doctrine's purpose is "to avoid overdeterrence" and to "ensure that suits inapposite to the goals of the antitrust laws are not litigated and that persons operating in the market do not restrict procompetitive behavior because of a fear of antitrust liability."  Id.

To have antitrust standing, a plaintiff must have "suffered an injury of the kind antitrust laws were intended to prevent, such that Plaintiff is a proper party to bring a federal antitrust suit." Id. The Supreme Court established a six-factor test to determine whether a plaintiff has antitrust standing -- and the Court must "consider the balance of factors in each case."  See, e.g., Sullivan v. Tagliabue, 25 F.3d 43, 46 (1st Cir. 1994).  These factors are:

(1) the causal connection between the alleged antitrust violation and harm to Plaintiff;
(2) an improper motive;
(3) the nature of Plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury");
(4) the directness with which the alleged market restraint caused the asserted injury;
(5) the speculative nature of the damages; and
(6) the risk of duplicative recovery or complex apportionment of damages.

Id. (citing Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 537-45 (1983)).

---

[4] Here, the Defendants have not challenged Plaintiff's constitutional standing, and, indeed, it appears that Plaintiff has constitutional standing to bring this suit.  Cf.  Walker v. Analog Devices, Inc., No. 22-11934-PBS, 2023 U.S. Dist. LEXIS 147353, at *5 n.5 (D. Mass. Aug. 4, 2023) (in the antitrust context, declining to engage in a fulsome constitutional standing analysis where the Defendant had not contested the issue and where there appeared to be "no issue in that regard.")

In this Circuit, a particular emphasis is placed on causation.  See e.g., RSA Media, Inc, v. Media Grp., Inc., 260 F.3d 10, 14 (1st Cir. 2001) ("Although we technically balance the six factors to determine if standing is appropriate [ ], this Court has emphasized the causation requirements of that test." (citations omitted)).  The first and the fourth factors require causation expressly.  Id. And even though the third factor does not expressly reference causation, the Supreme Court has defined "antitrust injury" as "injury of the type the antitrust laws were intended to prevent and that *flows from that which makes the defendants' acts unlawful*." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (emphasis added).

As the First Circuit has explained, to make out an antitrust injury, "[p]laintiffs must show not only that they were injured as a result of the defendant's actions and that those actions constituted an antitrust violation, but also that their injury is the type of injury the antitrust violation would cause *to competition*."  Sterling Merch., Inc. v. Nestlé, S.A., 656 F.3d 112, 121 (1st Cir. 2011) (emphasis in original).  Notably, the First Circuit has also noted that the absence of an "antitrust injury" will "generally defeat standing."  Id.

Plaintiffs bear the burden of proving an antitrust injury.  Id. (citation omitted).  To be sure, the Rule 12(b)(6) standard applies to motions to dismiss that argue that a plaintiff lacks antitrust standing.  E.g., In re Amitiza Antitrust Litig., No. 21-CV-11057-MJJ, 2024 U.S. Dist. LEXIS 173663, at *28 (D. Mass. Aug. 21, 2024) (explaining that, "[t]he Rule 12(b)(6) standard applies to motions to dismiss for lack of antitrust standing. The court accepts as true all well-pleaded allegations and draws all reasonable inferences in the plaintiff's favor") (citation omitted).  Indeed, as another session of this Court has stated, "[a]t the motion to dismiss stage…'the question is not whether antitrust injury indeed occurred but whether plaintiffs allege facts from which antitrust

injury can be inferred.'" <u>Growers 1-7 v. Ocean Spray Cranberries, Inc.</u>, No. 12-12016-RWZ, 2014 U.S. Dist. LEXIS 61654, at *20 (D. Mass. May 2, 2014) (citation omitted).

### B. <u>Application</u>

Notably, neither the Jushi Defendants nor the Sammartino Defendants fully briefed the issue of Plaintiff's antitrust standing.  Their failure to raise any arguments relative to certain of the six factors that the Court must consider means that those arguments are deemed waived since the lack of antitrust standing does not implicate the subject matter jurisdiction of this Court.  <u>See e.g.</u>, <u>Hammes v. AAMCO Transmissions</u>, 33 F.3d 774, 778 (7th Cir. 1994) ("despite the suggestive terminology, 'antitrust standing' is not a jurisdictional requirement and is therefore waivable"); <u>Gerlinger v. Amazon.com, Inc.</u>, 526 F.3d 1253, 1256 (9th Cir. 2008) ("Lack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court.")  That said, both the Jushi Defendants and the Sammartino Defendants did each argue that Plaintiff had not sufficiently alleged an "antitrust injury" -- which of course is one of the six factors that this Court must consider.  [ECF No. 18 at 22-24]; [ECF No. 24:21-23].   Thus, although the Court deems any arguments that the Jushi Defendants and the Sammartino Defendants might have had regarding the other five antitrust standing factors waived, it will engage with the issue of whether Plaintiff has plausibly alleged that each of the Defendants caused it to sustain an "antitrust injury."  <u>Viamedia, Inc. v. Comcast Corp.</u>, 218 F. Supp. 3d 674, 691 n.8 (N.D. Ill. 2016) ("Defendants present a brief argument in a footnote that [plaintiff] lacks antitrust standing because it cannot assert claims based on alleged harm to [multichannel video programming distributors]. Such cursory arguments are deemed waived") (citations omitted).  That said, the Court is mindful that although arguments relative to the other five factors would of course have affected its antitrust

standing analysis, the absence of an "antitrust injury" will "generally defeat standing." Sterling

Merch., 656 F.3d at 121.

## C.  Application -- Presence of an "Antitrust Injury"

The Jushi Defendants argue that Plaintiff failed to plausibly allege an antitrust injury

because "Plaintiff's alleged harm is not aligned with the expected anticompetitive effects of Jushi's

alleged behavior."  [ECF No. 24 at 22].  Specifically, the Jushi Defendants argue that the

anticompetitive effects of their alleged behavior -- namely "higher prices and limited and lower

quality services" -- could only harm consumers and shoppers and thus not Plaintiff.  [Id.]  The

Jushi Defendants further argue that Plaintiff has failed to show that their alleged injury flows from

any "competition-*reducing* aspect or effect of the defendant's behavior" such that an antitrust

injury has occurred.  [Id at 22 (citing Atlantic Richfield Co. v. USA Petroleum, Co., 495 U.S. 328,

344) (emphasis in original)].

This line of argument is unavailing.  Plaintiff has plausibly alleged at this early stage that

the Jushi Defendants caused them to sustain an antitrust injury.  Taking, as it must, all of Plaintiff's

well-pleaded allegations as true and drawing all reasonable inferences in their favor, the Complaint

contains at least four (4) species of allegations "from which antitrust injury can be inferred.'" See

Growers 1-7, 2014 U.S. Dist. LEXIS 61654 at *20.  Specifically, Plaintiff has alleged that the

Jushi Defendants' conduct wrongfully delayed their entrance into the relevant market.  See e.g.,

[ECF No. 1 at 23-24].  Second, Plaintiff has alleged that the Jushi's Defendant's conduct unfairly

shielded their dominant market share.  [Id. at 27].  Thirdly, the Complaint alleges that the Jushi

Defendant's conduct created an anti-competitive market; which is a required component of the

antitrust injury inquiry.  [Id. at 27]; Sterling Merch., Inc., 656 F.3d at 121 (explaining that

"Plaintiffs must show not only that they were injured as a result of the defendant's actions and that

those actions constituted an antitrust violation, but also that their injury is the type of injury the antitrust violation would cause *to competition*") (emphasis in original).   Lastly, Plaintiff has sufficiently alleged that it has lost significant revenue due to the Jushi Defendant's conduct.  [ECF No. 1 at 25].  Accordingly, this Court finds that Plaintiff has sufficiently plead that the Jushi Defendants caused them to sustain an antitrust injury.  See e.g., Growers 1-7, 2014 U.S. Dist. LEXIS 61654 at *20 (finding at the motion to dismiss stage that antitrust plaintiffs had plausibly advanced an antitrust injury).

The Sammartino Defendants argue that Plaintiff "advance[d] no allegations that higher prices or lower quality products cause[d] *it* to suffer any injury" and that Plaintiff advanced "no allegations supporting that higher prices or lower quality products have or will, in fact, occur in the relevant market."  [ECF No. 18 at 23 (emphasis in original)].  These arguments are unconvincing.  Plaintiff has at this early stage sufficiently alleged that as parties to the Defendants' Corporate Agreement, the Sammartino Defendants are liable for the same actions, described *supra*, that support the Court's conclusion that the Jushi Defendants caused Plaintiff to suffer an antitrust injury.  Accordingly, this Court finds that Plaintiff has sufficiently plead that the Sammartino Defendants caused them to sustain an antitrust injury.  See e.g., Growers 1-7, 2014 U.S. Dist. LEXIS 61654 at *20.

Since the Court has concluded that Plaintiff has sufficiently alleged antitrust injuries and because the Defendants waived argument on the other five factors of the antitrust injury inquiry, the Court concludes that Plaintiff has antitrust standing to bring its federal and state antitrust claims against both the Jushi Defendants and the Sammartino Defendants.  Because the Court has determined that Plaintiff has antitrust standing to bring its three antitrust claims (i.e., Counts I, II, and IV) against both the Jushi Defendants and the Sammartino Defendants, it will now turn to the

merits of those claims.  Vázquez-Ramos, 55 F.4th at 296 ("Satisfied that all plaintiffs have standing to bring their federal antitrust claims, we proceed to assess whether the amended complaint actually alleges antitrust claims.")

## V.    The Noerr-Pennington Doctrine

### A.  Legal Landscape

The dominant theme that runs throughout both the Jushi Defendants' and the Sammartino Defendants' motions to dismiss is that the Noerr-Pennington doctrine provides complete antitrust immunity for their actions.  See United Mine Workers of Am. v. Pennington, 381 U.S. 657, 669 (1965); E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 136 (1961).  As the First Circuit has explained, the Noerr-Pennington doctrine "provides a party immunity from antitrust liability for petitioning the government for redress, in light of the First Amendment right to petition the government."  United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp., 902 F.3d 1, 4 (1st Cir. 2018).  The doctrine is "similarly applicable to acts of advocacy before agencies and courts."  In re Prograf Antitrust Litig., No. 1:11-md-2242-RWZ, 2012 U.S. Dist. LEXIS 12053, at *12 (D. Mass. Feb. 1, 2012) (citation omitted)).

The doctrine has two exceptions.  See e.g., Tuosto v. Philip Morris USA Inc., 2007 U.S. Dist. LEXIS 61669, at *14 (S.D.N.Y. Aug. 21, 2007) ("[t]here are two exceptions to the protective reach of the Noerr-Pennington doctrine: the 'mere sham' exception and the 'unethical' exception") (citation omitted); Alaska Cargo Transp. v. Alaska R.R. Corp., 834 F. Supp. 1216, 1227-28 (D. Alaska 1991) ("The doctrine does have two exceptions to its application…[t]he first exception arises from the existence of a 'sham' campaign, where one uses the governmental process itself as an anti-competitive weapon…[t]he second exception…concerns illegal or fraudulent lobbying activities occurring in a judicial or quasi-judicial setting.")

Only the latter exception -- the so-called "sham exception" -- is possibly applicable here. The Supreme Court has articulated a two-prong test for Courts to use when determining whether the sham exception applies.  The burden is on an antitrust plaintiff to show the applicability of the sham exception and thus defeat a defendant's Noerr-Pennington immunity.  Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60-61 (1993) [hereinafter, "PREI"].

To make a sham showing, an antitrust plaintiff must first, demonstrate that the lawsuit or administrative filing-at-issue is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; and  second, that "the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor' through the 'use [of] the governmental *process* -- as opposed to the *outcome* of that process -- as an anticompetitive weapon.'" United Food & Comm. Workers, 902 F.3d at 13 (emphasis in original) (quoting PREI, 508 U.S. at 60-61).

The Noerr-Pennington doctrine functions as an affirmative defense.  Thus, it follows that antitrust plaintiffs are under no obligation to preemptively predict and then respond to such arguments in their complaints.  See, e.g., Oakes v. United States, 400 F.3d 92, 98 (1st Cir. 2005) (stating the rule that, "a plaintiff generally is not required to negate an affirmative defense unless and until the defendant has placed it in issue." (citations omitted)).  This is likely why, as *many* other federal courts have concluded, "the Noerr-Pennington defense is 'typically only properly analyzed through a consideration of evidence outside of the pleadings and as such, [is usually] not appropriately considered in [a] Rule 12(b)(6) context.'" Constr. Cost Data, LLC v. Gordian Grp., Inc., No. H-16-114, 2017 U.S. Dist. LEXIS 77481, at *15-16 (S.D. Tex. Apr. 24, 2017) (alteration in original) (internal citations omitted) (collecting cases).

Indeed, federal district courts regularly decline to reach the merits of this very type of affirmative defense in the antitrust context, *especially* when the sham litigation exception may be at issue.  See e.g., Navient Sols., LLC v. Law Offices of Jeffrey Lohman, No. 1:19-cv-461(LMB/TCB), 2020 U.S. Dist. LEXIS 65648, at *12 (E.D. Va. Apr. 14, 2020) (collecting cases and explaining that "Courts have routinely declined to address the Noerr-Pennington doctrine at the motion to dismiss stage, particularly where the sham litigation exception may be involved"); I-Minerals USA, Inc. v. Zielke, No. 1:15-cv-00094-MOC-DLH, 2015 U.S. Dist. LEXIS 123686, at *12 (W.D.N.C. Sep. 16, 2015) ("mere reference to the alleged sham lawsuit on the face of the complaint does not determine whether the Noerr-Pennington doctrine bars Plaintiffs' claims as a matter of law.  The court therefore finds that dismissal based on the assertion of the Noerr-Pennington affirmative defense inappropriate at this stage in the proceedings") (citation omitted).

## B.  Application

Here, neither the Jushi Defendants nor the Sammartino Defendants have made a convincing argument that the Court should deviate from this well-established approach.  Accordingly, the Defendants' attempted reliance on the Noerr-Pennington doctrine at this early stage of the litigation is rejected.  See e.g., Navient Sols., LLC, 2020 U.S. Dist. LEXIS 65648, at *12 ("Defendants make no argument that supports departure from this established practice. Accordingly, defendants' reliance on the Noerr-Pennington doctrine at this stage is rejected.")

## VI.  The Antitrust Claims (Counts I, II, and IV)

### A.  Relevant Market

#### i.  Legal Landscape

Plaintiff has not alleged any *per se* violations of the Sherman Act or of the Massachusetts antitrust statute.  Thus, an element that is common to all three of Plaintiff's antitrust claims is

"proof that [defendants] exercise[] or could exercise a threshold degree of market power." Vázquez-Ramos, 55 F.4th at 296. Therefore, the court will address this issue first. Inherent in the market power analysis is an accurate definition of the "relevant market." See Ohio v. Am. Express Co., 138 S. Ct. 2274, 2285 (2018) (explaining that that "courts usually cannot properly apply the rule of reason" in a *Section 1* claim "without an accurate definition of the relevant market"); Díaz Aviation Corp. v. Airport Aviation Servs. Inc., 716 F.3d 256, 265 (1st Cir. 2013) (noting that ":monopoly power" in the context of a *Section 2* claim "is typically proven by defining a relevant market and showing that the defendant has a dominant share of that market").

To ultimately prevail on its antitrust claims, Plaintiff must *in due course* "adduc[e] enough evidence to permit a reasonable factfinder to define the relevant market." Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016). The relevant market is "the area of effective competition and includes both a relevant geographic market and a relevant product market." Vázquez-Ramos, 55 F.4th at 296 (internal citations and quotation marks omitted). At the motion to dismiss stage, question is "only" whether the complaint "alleges facts that plausibly delineate a relevant market." Id. at 297-298. As another federal district court recently explained, "[l]ike the other elements of an antitrust claim, an alleged market need not be pleaded with specificity; it will survive a 12(b)(6) motion to dismiss 'unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect.'" Volkswagen Grp. of Am., Inc. v. Smartcar, Inc., No. 21-cv-04895-JST, 2024 U.S. Dist. LEXIS 173778, at *20 (N.D. Cal. Sep. 25, 2024) (citation omitted).

### B. **Application**

Here, Plaintiff alleges a relevant market defined by the following geographic characteristics: the town of Tynsborough, Massachusetts, "northern Massachusetts" and the "greater Merrimack Valley region." [ECF No. 1 at 4]. In terms of the relevant product, Plaintiff

alleges the following characteristics: the "$35 million per year (legalized and growing) adult, recreational cannabis market." [Id.] Both the Jushi Defendants and the Sammartino Defendants argue that Plaintiff has failed to allege a relevant market. [ECF No. 18 at 23 ("MJ's advances no allegations even concerning the relevant market or the businesses serving that market…")]; [ECF No. 23 at 6 ("…other than conclusory allegations, Plaintiff does not elaborate on the details of Jushi's monopoly or the makeup of the alleged relevant market…")]. These arguments are unavailing. Plaintiff's articulation of the relevant market is coherent and easily crosses the pleading threshold. In other words, it is by no means apparent from the face of the complaint that the alleged market definition suffers a fatal legal defect. See Volkswagen Grp. of Am., Inc. v. Smartcar, Inc., 2024 U.S. Dist. LEXIS 173778, at *20. Having determined that Plaintiff has plausibly alleged a relevant market, the Court turns next to the other required elements of the Section 1 and Section 2 claims.

## VII.   Count I: Violation of 15 U.S.C. § 1

Count I alleges that all of the Defendants engaged in a conspiracy to restrain trade in violation of the Sherman Act, 15 U.S.C. § 1 ("Section 1").

### A.   Legal Landscape

In relevant part, Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." As the Supreme Court has explained, the purpose of the Sherman Act is to "assure customers the benefits of price competition" -- which includes "protecting the economic freedom of participants in the relevant market." Associated Gen. Contractors, 459 U.S. at 538 (citing United States v. Topco Assocs., Inc., 405 U.S. 596, 610 (1972)). Although the text of the Sherman Act prohibits *every* agreement "in restraint of trade,"

20

the Supreme Court has repeatedly recognized that "Congress intended to outlaw only

unreasonable restraints" -- meaning that most antitrust claims are reviewed:

> [U]nder a "rule of reason," according to which the finder of fact must decide
> whether the questioned practice imposes an unreasonable restraint on competition,
> taking into account a variety of factors, including specific information about the
> relevant business, its condition before and after the restraint was imposed, and the
> restraint's history, nature, and effect.

State Oil Co. v. Khan, 522 U.S. 3, 10(1997) (citing Arizona v. Maricopa Cnty Med. Soc'y, 457

U.S. 332, 343 & n.13 (1982)).  At bottom, the "true test of legality" under the Sherman Act is

"whether the restraint imposed is such as merely regulates and perhaps thereby promotes

competition or whether it is such as may suppress or even destroy competition."  Bd. of Trade of

Chi. v. United States, 246 U.S. 231, 238 (1918).

In our Circuit, a Section 1 claim has two elements: (1) first, there must be "concerted

action" and, (2) second, "the actors' agreement must involve either restrictions that are per se

illegal *or* restraints of trade that fail scrutiny under the rule of reason."  Euromodas, Inc. v. Zanella,

Ltd., 368 F.3d 11, 16 (1st Cir. 2004) (emphasis added) (citing Monsanto Co. v. Spray-Rite Serv.

Corp., 465 U.S. 752, 761 (1984)).  "Concerted action" occurs for purposes of Section 1 when "two

or more entities that previously pursued their own interests separately are combining to act as one

for their common benefit."  Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 769 (1984).[5]

---

[5] There is a distinction under the Sherman Act between concerted action by separate entities and
unilateral action by a single firm.  As another session of this Court recently observed, a single firm
faces liability only if it engages in conduct that "threatens actual monopolization" and that:

> Otherwise, "an efficient firm" may act vigorously to "capture unsatisfied customers from
> an inefficient rival, whose own ability to compete may suffer as a result," because such
> "competitive zeal" by a single actor "is precisely the sort of competition that promotes the
> consumer interests that the Sherman Act aims to foster."

United States v. Am. Airlines Grp., 675 F. Supp. 3d 65, 108 (D. Mass. 2023) (citing Copperweld,
467 U.S. at 767-768).

21

With respect to the second prong, Plaintiff has not alleged any *per se* illegality, so this Court will only outline the legal standard that it must therefore apply to Plaintiff's Count I claim -- namely, the "rule of reason analysis." See, e.g., Walker v. Analog Devices, Inc., No. 22-11934-PBS, 2023 U.S. Dist. LEXIS 147353, at *12 (D. Mass. Aug. 4, 2023) (rR. & R. adopted and case dismissed by 2023 U.S. Dist. LEXIS 146538 (D. Mass. Aug. 18, 2023), affirmed 2024 U.S. App. LEXIS 23662 (1st Cir. May 30, 2024)) ("[B]ecause there is no per se illegality, the rule of reason analysis should be used [to assess a Section 1 claim at the motion to dismiss stage].") (citation omitted), aff'd, No. 23-1739, 2024 U.S. App. LEXIS 23662 (1st Cir. 2024).

The rule of reason analysis calls for courts to engage in a "fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition." Vázquez-Ramos, 55 F.4th at 299 (quoting Ohio v. Am. Express Co., 585 U.S. 529, 541 (2018)) (alteration in original). The "purpose of this inquiry is to distinguish between restraints of trade 'that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.'" Id. (quoting Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007)). Courts typically apply a burden-shifting framework in this context. Id. (citing Am. Express, 585 U.S. at 541).

Vázquez-Ramos teaches that the Section 1 rule of reason analysis essentially proceeds in three sequential steps:

> First, Plaintiff must "prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." [Second], the burden shifts to the defendant to demonstrate "a procompetitive rationale for the restraint." [Third and finally], the burden shifts back to Plaintiff to establish that "the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."

Id. (quoting Am. Express, 585 U.S. at 541).

Importantly for present purposes, the <u>Vázquez-Ramos</u> Court also recognized that applying this framework "usually requires some fairly detailed facts, the ascertainment of which is *often beyond the scope of a Rule 12(b)(6) inquiry*." 55 F.4th at 299 (emphasis added) (citations omitted).

### B. <u>Application</u>

Applying this legal framework, the first question is whether Plaintiff has plausibly alleged that the Jushi Defendants and/or the Sammartino Defendants engaged in "concerted action." The Complaint contains several allegations that plainly involve concerted action. For example, Plaintiff points to the existence and the nature Defendants' Corporate Agreement; arguing that its purpose was in part to "hinder, impede, delay, obstruct, and/or prevent" Plaintiff's attempts to secure approvals and develop a store that would compete with the Defendants. [ECF No. 1 at 22]. Further, Plaintiff alleges that Jushi and Valiant "*agreed jointly*" to object to Plaintiff's applications to the Planning Board and the Zoning Board of Appeals. [<u>Id.</u> at 23 (emphasis added)]. Plaintiff further alleges that the "Defendants *coordinated their efforts* in preparing, advancing and now in prosecuting" their complaints and oppositions, and that this coordination included, for example, "working cooperatively on correspondence, talking points, plans and sketches, pleadings, briefs, motions and other documents…" [<u>Id.</u> at 24 (emphasis added)]. Neither the Jushi Defendants nor the Sammartino Defendants directly briefed the issue of concerted action, nor did they meaningfully challenge the factual allegations cited above. Given the specificity and nature of Plaintiff's allegations on this score, coupled with the lack of any meaningful refutation by the Defendants, the Court easily concludes that Plaintiff has plausibly alleged concerted action relative to both the Jushi Defendants and the Sammartino Defendants.

The Court therefore turns next to the Section 1 rule of reason analysis, which begins by inquiring whether Plaintiff has plausibly alleged that the challenged restrain has a substantial

anticompetitive effect that harms consumers in the relevant market.  Vázquez-Ramos, 55 F.4th at

299 (citation omitted).  Plaintiff has lodged several allegations bearing on this issue.  Plaintiff has

alleged that the Jushi Defendants' and the Sammartino Defendants' alleged conduct has "also

insulated Defendants from competing by preventing the offering of new, diverse, and higher

quality goods and services *to the detriment of consumers in the marketplace*" and that their alleged

restrain of trade has "resulted in anticompetitive effects throughout the relevant market, *including

higher prices, constrained services, and less choices for consumers*."   [ECF No. 1 at 23-24

(emphasis added)].  Although they each had the option to do so, neither the Jushi Defendants nor

the Sammartino Defendants countered with assertions that there is a "a procompetitive rationale

for the restraint."  Vázquez-Ramos, 55 F.4th at 299.  Especially since one of Plaintiff's core

allegations is that it constituted the Defendants' "*only* possible competitor" in the relevant market

[ECF No. 1 at 13 (emphasis added)], the Court finds that it has plausibly alleged that the

Defendants' restraint on trade has had a substantial anticompetitive effect on consumers in the

relevant market (as defined *supra*).   Accordingly, the Court concludes that Plaintiff has stated a

Section 1 claim against both the Jushi Defendants and the Sammartino Defendants.

**VIII.   Count II: Violation of 15 U.S.C. § 2**

Count II alleges that all of the Defendants violated Section 2 of the Sherman Act.  15

U.S.C. § 2 ("Section 2").

**A.  Legal Landscape**

Section 2 makes it unlawful for any person to "monopolize, or attempt to monopolize, or

combine or conspire with any other person or persons, to monopolize any part of the trade or

commerce among the several States, or with foreign nations."  Apple Inc. v. Pepper, 587 U.S.

273, 279 (2019) (citing Section 2).  As the First Circuit has explained, to make out a Section 2

claim, a plaintiff must demonstrate, "(1) that the defendant possesses 'monopoly power in the relevant market,' and (2) that the defendant has acquired or maintained that power by improper means." Town of Concord v. Bos. Edison Co., 915 F.2d 17, 21 (1st Cir. 1990) (citation omitted). As the Supreme Court has pointed out, the "mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004). Indeed, the High Court has reasoned that, "[t]he opportunity to charge monopoly prices--at least for a short period--is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." Id. (emphasis in original).

**B.  Application**

Applying this legal framework, the first question is whether Plaintiff has plausibly alleged that the Jushi Defendants and/or the Sammartino Defendants possess monopoly power in the relevant market. The Complaint contains several allegations that, taken together, plausibly allege that both groups of Defendants possess monopoly power in the relevant market as defined *supra*. First and foremost, Plaintiff alleges that "by virtue of owning the only retail operation in [Tynsborough,] [Defendants] control the market, *hold monopoly power*, which in turn gives Defendants the ability to artificially control prices. . . ." [ECF No. 1 at 4 (emphasis added)]. Indeed, Plaintiff has plausibly alleged that customers in the relevant market are experiencing "the absence of competition in the market through higher prices and more limited/lower-quality services." [ECF No. 1 at 27]. Importantly, neither the Jushi Defendants nor the Sammartino Defendants seem to dispute the alleged fact that Defendant Nature's Remedy is the only participant

selling the relevant product in the relevant market.  See e.g., [Id (Plaintiff pointing out that the Defendants "have admitted their position during the aforesaid appeals that the only participant in the subject market permitted in Tyngsborough is Defendants' establishment…")]  Accordingly, Plaintiff's allegations are sufficient at this stage to satisfy the monopoly power requirement relative to both the Jushi Defendants and the Sammartino Defendants.  See e.g., Vázquez-Ramos, 55 F.4th at 299 (finding that where plaintiffs had alleged that "[defendant] is *the sole provider* of urology services to Mi Salud patients in Western Puerto Rico, giving it monopoly power in the relevant market and leaving patients with only one choice of provider," the pleading standard had been satisfied) (emphasis added).

The next inquiry is whether the Jushi Defendants and/or the Sammartino Defendants "acquired or maintained" their monopoly power "by improper means."  Plaintiff has alleged that the Defendants acquired their position of monopoly power through improper means, including through, "the institution and perpetuation of sham objections and litigation" aimed at gaining and preserving this position.  [ECF No. 1 at 26].  Plaintiff also alleges that certain express terms of the Defendants' Corporate Agreement constitute an improper scheme to prevent Plaintiff's entrance into the market and thus preserve their monopoly position.  [Id.]  Plaintiff also alleges that "Defendants intentionally and willfully conspired with each other and other currently unknown persons and entities to monopolize the adult use recreational marijuana market by way of the acts set forth above, including, but not limited to…maintenance of sham objections and litigations, as well as other anti-competitive acts, and to stall and delay the administrative and judicial processes."  [Id. at 27].  In response, both the Jushi Defendants and the Sammartino Defendants counter that Plaintiff's allegations are merely conclusory and fall short of plausibly pleading, among other things, that their petitioning activity was objectively baseless and thus suggestive of

26

improper means.  See e.g., [ECF No. 18 at 18]; [ECF No. 24 at 13-17].  Despite these protestations, it is clear to the Court that Plaintiff's allegations are sufficient at this stage to satisfy the improper means requirement.  See e.g., Fraser v. Major League Soccer, L.L.C., 284 F.3d 47, 61 (1st Cir. 2002) ("In section 2 cases, the wrongful act is usually one designed to exclude competitors from the market (e.g., predatory price, exclusive dealing) …")  Accordingly, the Court finds that Plaintiff has stated a Section 2 claim against both the Jushi Defendants and the Sammartino Defendants.

## IX.    Count IV: Violation of the Massachusetts Antitrust Act

Count IV alleges unlawful constraint of trade in violation of the Massachusetts Antitrust Act, Mass. Gen. Laws ch. 93, §§ 1-14A.

### A.    Legal Landscape

Section 4 of the Massachusetts Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the commonwealth shall be unlawful."  Mass. Gen. Laws ch. 93, § 4.  Under Section 12 of this statute, a civil action may be brought by "[a]ny person who shall be injured in his business or property by reason of a violation" of the Act.  Mass. Gen. Laws ch. 93, § 12.  By its very terms, the Massachusetts Antitrust Statute must be construed in harmony with comparable federal antitrust statutes -- like the Sherman Act.  Mass. Gen. Laws ch. 93, § 1.  Accordingly, the fate of Plaintiff's Count IV claim necessary rises and falls with the Court's treatment of Count I and Count II (i.e., the Sherman Act claims).  See, e.g., Winter Hill Frozen Foods & Servs., Inc. v. Haagen-Dazs Co., 691 F. Supp. 539, 543 n.5 (D. Mass. 1988) (explaining that the Massachusetts Antitrust Act "is construed in harmony with Section 1 of the Sherman Act, and the same principles and analysis under the federal claim apply to this particular state law claim" and that, accordingly, plaintiff's

"state antitrust claims are *subsumed by this discussion* of federal antitrust law" (emphasis added));
Bristol Asphalt Co. v. Rochester Bituminous Prods., No. 2083CV00611, 2021 Mass. Super.
LEXIS 1339, at *18 (Mass. Super. Aug. 30, 2021) (finding that the "plaintiffs have . . . alleged
conduct by the defendants that falls within the prohibition of the Massachusetts [Antitrust] Act.
However, such conduct would not violate the Sherman Act, *and by extension the Massachusetts*
*[Antitrust] Act*, if it falls within the Noerr-Pennington doctrine" (emphasis added)).

### B. Application

Since the Court has already determined that Plaintiff has stated a claim under both Section
1 and Section 2 of the Sherman Act, it finds that, for the same reasons, Plaintiff has stated a claim
under the Massachusetts Antitrust Act.  Cf. C. R. Bard, Inc. v. Med. Elecs. Corp., 529 F. Supp.
1382, 1391 (D. Mass. 1982) (dismissing a Massachusetts Antitrust Act claim without separate
analysis after concluding that the claimant had failed to state a claim under both Section 1 and
Section 2 of the Sherman Act.)

## X.    Count III: Unfair Competition under Mass. Gen. Laws ch. 93A

Count III alleges that all of the Defendants engaged in unfair competition under Mass. Gen.
Laws ch. 93A ("93A").

### A. Legal Landscape

In relevant part, the Massachusetts Consumer Protection Act declares unlawful any
"[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any
trade or commerce . . ."  93A § 2(a).  Section 11 of 93A provides a private right of action for
alleged violations of Section 2. Id. § 11. A Section 11 plaintiff may be "[a]ny person who engages
in the conduct of any trade or commerce . . ."  Id. The Massachusetts Supreme Judicial Court
("SJC") has determined that when the Massachusetts Legislature used this phrase, it intended "to

refer specifically to individuals acting in a business context." Lantner v. Carson, 373 N.E.2d 973, 976 (Mass. 1978). Further, Section 11 claims must occur "primarily and substantially" within the Commonwealth of Massachusetts. 93A § 11.

A Section 11 claim has three elements. Plaintiff must prove that "(1) the defendant engaged in an unfair method of competition or committed an unfair deceptive act or practice; (2) a loss of money or property was suffered; and (3) the defendant's unfair or deceptive method, act or practice caused the loss suffered." Anoush Cab, Inc. v. Uber Techns., Inc., 8 F.4th 1, 16 (1st Cir. 2021) (citing Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 17 N.E.3d 1066, 1074-75 (Mass. 2014)). Further, Plaintiff "must establish both factual causation and proximate causation." Id. at 16 (quoting LimoLiner, Inc. v. Dattco, Inc., 919 F.3d 86, 90 (1st Cir. 2019)). If they prevail, a Section 11 plaintiff is entitled to actual damages, or double or treble damages if the defendant's violation of § 2 was willful or knowing. 93A, § 11.

   **B.** <u>**Application**</u>

With all inferences drawn in its favor, the Court finds that Plaintiff has stated a Section 11 claim. Just by way of example, Plaintiff has alleged that the Jushi Defendants and the Sammartino Defendants have engaged in an unfair method of competition, to wit, "the institution and perpetuation of sham objections and litigation" aimed at gaining and preserving this monopolistic position. [ECF No. 1 at 26]. Moreover, Plaintiff has also alleged that the Jushi Defendants and the Sammartino Defendants have committed an unfair or deceptive act, such as entering into an agreement which allegedly contain certain express terms that indicate anticompetitive intent. [Id.] Plaintiff has also sufficiently alleged that this unfair competition caused the loss of money. [Id. at 6 (Plaintiff alleging that Defendants' actions have resulted in "more than $45 million of lost revenue and saddling Plaintiff with hundreds of thousands of dollars of additional costs, legal fees

and expenses fighting Defendants' bogus objections and zoning appeals.")]  Accordingly, at this early stage, the Court finds that Plaintiff has stated a Section 11 claim against both the Jushi Defendants and the Sammartino Defendants.  Notably, neither the Jushi Defendants nor the Sammartino Defendants directly briefed the merits of Plaintiff's Section 11 claim.  [See ECF No. 24 at 24 (Jushi Defendants reasoning that since the "93A claim is derivative of Plaintiff's other claims, if the Court dismisses Plaintiff's other claims, it should dismiss Plaintiff's 93A claim as well…")]; [ECF No. 18 at 21 (Sammartino Defendants reasoning that, "[h]ere, there is no doubt that the same allegations underlying MJ's Sherman Act claims likewise underlie its claims for violation of Chapter 93A, violation of the Massachusetts Antitrust Act, interference with advantageous contractual and business relations, and malicious use of process.")]

## XI.    Count V: Interference with Advantageous Contractual and Business Relations

Count V alleges that all of the Defendants interfered with Plaintiff's advantageous contractual and business relations.

### A.    Legal Landscape

To state a claim for this business tort under Massachusetts law, a plaintiff must prove that: "(1) [it] had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant[s] knowingly induced a breaking of the relationship; (3) the defendant[s'] interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) Plaintiff was harmed by the defendant[s'] actions."  Blackstone v. Cashman, 860 N.E.2d 7, 12-13 (Mass. 2007) (citing Weber v. Cmty. Teamwork, Inc., 752 N.E.2d 700, 715 (2001)).  A claimant "must not only prove that [the alleged tortfeasor] intentionally interfered with his business relationship but also that [that party] had a duty of non-interference; i.e., that he interfered for an improper purpose rather than for a legitimate one, or that [the party] used improper means which resulted in injury."  Santander Bank, N.A. v.

Baldwin Realty, LLC, No. 13-13161-FDS, 2015 U.S. Dist. LEXIS 50841, at *16 (D. Mass. Apr. 17, 2015) (citations omitted).

### B.  Application

Applying this legal framework, Plaintiff has certainly alleged that it had an advantageous business relationship with a third party, to wit, the Town of Tynsborough.  [ECF No. 1 at 29-30]. Second, Plaintiff has plausibly alleged that both the Jushi Defendants and the Sammartino Defendants knowingly hindered, impeded, obstructed, and delayed Plaintiff from obtaining the necessary governmental approvals.  [Id at 30].  Third, and for the reasons stated in more depth supra, Plaintiffs have sufficiently alleged that both the Jushi Defendants and the Sammartino Defendants acted intentionally and improperly, and Plaintiff has also plausibly alleged that harm resulted.  [See e.g., Id. at 6].  Neither the Jushi Defendants nor the Sammartino Defendants directly briefed the merits of their defense(s) to this tort.  With all inferences drawn in its favor, the Court finds that Plaintiff has stated a claim for interference with its advantageous contractual and business relations against both the Jushi Defendants and the Sammartino Defendants.

### XII.  Count VI: Abuse of Process[6]

Count VI alleges that all of the Defendants committed the tort of abuse of process.

---

[6] Count VI is captioned "Malicious Use of Process."  [ECF No. 1 at 30].  Later in their Complaint, Plaintiff used the phrase "Defendants maliciously **abused** process..."  [Id. at 32].  Since the Court believes that Plaintiff intended to sue the Defendants for the more well-defined tort of "Abuse of Process," the Court has construed Count VI accordingly.  See Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").  This distinction makes little difference -- especially since malice is a necessary element of both types of claims.  See, e.g., Shaw v. Fulton, 165 N.E. 26, 27 (Mass. 1929) ("An action for the abuse of process or the malicious use of process does not lie in the absence of malice." (citation omitted)).

### A.  **Legal Landscape**

As a matter of Massachusetts law, the elements of abuse of process are: "(1) 'process' was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage." Fabre v. Walton, 781 N.E.2d 780, 783 n.3 (Mass. 2002) (quoting Vittands v. Sudduth, 730 N.E.2d 325, 332 (Mass. App. Ct. 2000)).  The SJC has defined "process" in this context to mean "the papers issued by a court to bring a party or property within its jurisdiction." Jones v. Brockton Pub. Mkts., Inc., 340 N.E.2d 484, 486 (Mass. 1975).  The SJC has observed that the tort "has been described as a 'form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money[,]' Fabre, 781 N.E.2d at 783 n.3 (quoting Vittands, 730 N.E.2d at 332)," and that it is the "subsequent misuse of the process, though properly obtained [that] constitutes the misconduct for which liability is imposed . . . ." Id. (quoting Kelley v. Stop & Shop Cos., 530 N.E.2d 190, 191 (Mass. App. Ct. 1988)).

### B.  **Application**

Applying this legal framework, the Court finds that Plaintiff has stated a claim for abuse of process against both the Jushi Defendants and the Sammartino Defendants. Plaintiffs have plausibly alleged that both used multiple forms of "process," including but not limited to the objections that they lodged during the Planning Board and the Zoning Board of Appeals[7] proceedings, as well as the subsequent litigation in state court.  Second, Plaintiff has plausibly alleged ulterior motive. [ECF No. 1 at 32 ("Defendants' actions were motivated by their malicious

---

[7] The Sammartino Defendants do point out that they were not signatories to the Zoning Appeal. While this does cut against the strength of Plaintiff's abuse of process claim against the Sammartino Defendants, Plaintiffs did allege, and the Sammartino Defendants have not disputed, that they were involved, among other things, in the objections lodged during the Town Proceedings.  [ECF No. 24 at 24].  This fact contributes to the survival of Plaintiff's abuse of process claim against the Sammartino Defendants.

desire to illegally and improperly maintain monopoly power in Tyngsborough for the goods and services Jushi and Plaintiff sell and to reap an additional $15 million in Antitrust Compensation.")].  Lastly, Plaintiff has sufficiently alleged that both the Jushi Defendants and the Sammartino Defendants' alleged use of process with this ulterior motive caused it damage.  [ECF No. 1 at 32-33].  Neither the Jushi Defendants nor the Sammartino Defendants briefed any opposition arguments that they might have had to this tort.  With all inferences drawn in its favor, the Court finds that Plaintiff has stated a claim for abuse of process against both the Jushi Defendants and the Sammartino Defendants.

## XIII.  <u>Conclusion</u>

For all of the foregoing reasons, both the Jushi Defendants motion to dismiss [ECF No. 23] and the Sammartino Defendants' motion to dismiss [ECF No. 17] are **<u>DENIED</u>**.

**SO ORDERED.**

Dated: February 5, 2025

<u>/s/ Margaret R. Guzman</u>
Margaret R. Guzman
United States District Judge