**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MJ'S MARKET, INC.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**JUSHI HOLDINGS, INC., et al.,**<br><br>**Defendants.** | **CIVIL ACTION NO. 4:23-cv-40037-MRG** |

**PLAINTIFF MJ'S MARKET, LLC'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff MJ's Market, LLC ("MJ's") respectfully moves pursuant to Fed. R. Civ. P. 56(a) for partial summary judgment on liability as to Count I (Sherman Act § 1) and Count III (G.L. c. 93A § 11), with damages reserved for trial. For the reasons set forth below and in MJ's accompanying memorandum, the undisputed record establishes that Defendants conspired to exclude MJ's from a lucrative, geographically concentrated cannabis market and thereby unlawfully engaged in restraint of trade and unfair competition.

## I. Introduction

This is not a case about an isolated regulatory objection, a technical zoning dispute, or the abstract application of antitrust doctrine. The undisputed facts show Defendants engaged in a deliberate effort to prevent competition from entering one of the most lucrative cannabis markets in Massachusetts. That unfair and anticompetitive conduct not only permitted Defendants to hold an exclusive retail position in a cross-border market generating approximately $30 million in annual revenue, it also delayed and derailed the competitive entry of a small cannabis startup,

straining its capital resources and management, drying up investment, and pushing the business beyond the breaking point, resulting in the complete demise of the enterprise.

The market was uniquely valuable because the Town of Tyngsborough had created a regulatory duopoly: only two cannabis retailers could operate there. Nature's Remedy was the first licensee and operator. The second license was, therefore, the only opportunity for a competitor to enter the market. Defendants' own internal documents establish that this market drew overwhelmingly from across the New Hampshire border—approximately 84% of Nature's Remedy's Tyngsborough customers came from New Hampshire cities and towns along the Route 3 corridor that passed straight through the border town of Tyngsborough. Defendants themselves identified the competitive market as that cross-border corridor, and its entry point area into Massachusetts – a particularly limited portion of Tyngsborough along Middlesex Road, immediately across the border from Nashua, New Hampshire, adjacent to the Pheasant Lane Mall, a casino and numerous other shopping malls, restaurants and retail destinations.

MJ's was not a speculative future competitor. It stood as the only one when selected for the second Host Community Agreement ("HCA") on March 22, 2021. At that point, Defendants did not respond by out competing. They responded by conspiring, incentivizing and acting to block MJ's from opening.

The undisputed facts in the record reveal a coordinated campaign, where Defendants closely monitored the potential competitors during due diligence of Jushi's planned acquisition of Nature's Remedy from Sammartino. Defendants distinguished competitors planning to enter the immediate, cross-border zone from competitors locating farther south at sites Jushi evaluated as serving a different customer base. Before MJ's selection, Defendants acquired a "dead lease" at 425 Middlesex Road, approximately 500 feet from Nature's Remedy's location, specifically to

block another potential competitor from locating there. The “dead lease” was the most expensive leasehold space in Nature’s Remedy’s portfolio and Jushi internal documents confirm its express purpose was to prevent a competitor from locating in that space. Its terms were so commercially unreasonable as to be unjustifiable under normal business practices. Defendants never used that site for anything commensurate with the $1.7 million premium rent paid to obtain it. Then after the Town selected MJ’s, Defendants immediately objected and advocated for the Town to reverse its decision and choose the one competitor that Jushi had determined was not in the competitive zone. The Town rejected that objection. Within days of MJ’s selection, Jushi also inserted a remarkable “Additional Merger Consideration” provision into the merger agreement that conditioned $10 million of the purchase price on the absence of a “Tyngsborough Competitor” within 2,500 feet of Nature’s Remedy’s location. Defendants then opposed MJ’s permitting applications at every turn, and when that failed, pursued a zoning appeal that delayed MJ’s entry.

As MJ’s was the only possible “Tyngsborough Competitor" that the provision could target, the $10 million “Additional Merger Consideration” provision was explicitly anticompetitive. It served no other purpose within the deal. It did not measure the performance of the acquired business. It did not reward revenue, earnings, customer retention, or any other legitimate business metric. It paid the Sammartino Parties more if MJ’s Market did not enter the protected market. Defendants’ own witnesses identified no procompetitive benefit from it.

The consequences were not theoretical nor were they naturally derived from inevitable circumstances. Defendants’ conduct was what delayed MJ’s project, chilled investment, and caused MJ’s real estate partners to defer construction. The delay caused strain between the Town and MJ’s, where the Town repeatedly sought assurances not contemplated in the HCA, including evidence of MJ’s financial backing and a commitment to build at risk, conditions that would not

have been raised absent Defendants' obstructive conduct and frivolous zoning appeal. Defendants' actions further strained MJ's leasehold with the 405-409 Middlesex Road site. Ultimately, the delay caused the Town to reissue solicitations for its remaining HCA. Without the Tyngsborough operation, MJ's lost the cash flow necessary to complete its other planned operations and lost investment interest, ultimately sounding the death knell for its entire business enterprise.

The antitrust laws prohibit precisely this kind of conduct: horizontal competitors cannot agree to insulate a lucrative market from competitive entry and then use private commercial arrangements and regulatory processes to accomplish that objective. The summary judgment record establishes liability as a matter of law.

## II. The Undisputed Record Establishes a Concerted Effort to Exclude MJ's from a Relevant Market

Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies that unreasonably restrain trade. Here, the concerted action is not inferred merely from parallel conduct. It is directly evidenced by the parties' agreement itself - from its inception through its execution - and the surrounding sequence of events that it triggered.

Defendants were separate economic actors when they negotiated the merger agreement. The $10 million Additional Merger Consideration provision was negotiated and memorialized as a contractual term. Its operation was straightforward: Defendants would receive the additional $10 million if a competing dispensary did not enter the defined geographic area. MJ's was the only possible entrant at that time, having been chosen by the Town for the second HCA.

The surrounding evidence eliminates any legitimate explanation for the provision. Defendants tracked potential competitors by location and specifically distinguished those capable of capturing New Hampshire border traffic. Their own analysis projected that competitive entry in

the immediate corridor could reduce Nature's Remedy's revenue, then approximately $30 million per year, by 25% to 50%. They then acted to prevent that competition.

The chronology speaks for itself and is not genuinely disputable. Defendants first sought to eliminate Nova Farms by securing the "dead lease." When the Town instead selected MJ's for the second HCA, Defendants shifted their focus to MJ's. Within days, they objected to MJ's selection. Shortly thereafter, they inserted the $10 million competitive-entry provision into their merger agreement. They then continued their opposition before the regulatory authorities and ultimately pursued a baseless zoning appeal. This was not competition on the merits. It was exclusion.

## III. The $10 Million Additional Merger Consideration Provision was Added as a Naked Restraint of Trade that Defendants Admit had No Pro-Competitive Purpose

The $10 million provision warrants per se treatment because its purpose and operation were to suppress competitive entry. At minimum, it warrants abbreviated "quick look" scrutiny.

The provision was not reasonably necessary to accomplish the merger. The merger agreement was substantially negotiated before the provision appeared. It was added only after MJ's had been selected as the second HCA candidate. Rather than measuring the acquired company's performance, the provision assured that performance by eliminating the one element that would undermine it, the presence of a competitor entering the particular geographic area where they enjoyed a monopoly.

The contemporaneous evidence supplies the missing piece: Defendants knew precisely what competition in that area was worth. They modeled substantial revenue losses from competitive entry, acquired property to prevent another competitor from locating there, and then structured the merger consideration to reward the continued absence of competition.

No elaborate economic model is necessary to understand the obvious anticompetitive intent and effect of the provision. The agreement said, in substance: if the competitor stays out, Sammartino Defendants would receive $10 million of the even greater amount of millions of revenues Jushi Defendants would reap; if the competitor gets in, they do not. The term does not operate to allocate or guard against risk or uncertainty in the deal based on any aspect of performance or results or metric that serves the marketplace. It was not tied to Tyngsborough sales or revenue or product development or enhanced selection. It is explicitly tied to keeping the competitor out. Defendants' witnesses have identified no procompetitive effect. Nature's Remedy's CEO testified affirmatively that its conduct had no procompetitive effect. Jushi's corporate witness testified that the additional-merger-consideration provision and the zoning appeal were "orthogonal" to any pro-competitive effect.

**IV. The Record Establishes the Competitive Injury and the Causal Chain**

MJ's was the actual second licensee selected by the Town. It had a site, an HCA, and a project that moved through and successfully navigated the local regulatory process to obtain a special permit and favorable zoning determination. Defendants knew MJ's was the competitor the Town had authorized to enter the market. Their restraint was expressly designed to prevent that entry.

The resulting injury followed the precise path that would naturally be expected from a restraint on competitive entry. Defendants delayed MJ's entry. Their zoning appeal caused MJ's real estate partners to defer construction and chilled investment. The prolonged delay caused the property owner to seek other suitors and the Town to lose patience and reissue its HCA solicitation after MJ's HCA expired. Without the Tyngsborough store and the revenue it was expected to generate, MJ's lacked the cash flow and investment interests necessary to fund its planned North

Grafton cultivation and manufacturing operations and expansion into other markets. The result was not merely a delayed opening; MJ's lost its entire business enterprise.

Thus, the injury is not remote from the alleged restraint. It is the very injury the restraint was designed to cause: exclusion of the authorized competitor from the market.

**V. The Same Conduct Independently Establishes Liability under Chapter 93A**

Even apart from federal antitrust law, Defendants' conduct establishes liability under G.L. c. 93A § 11. Chapter 93A reaches unfair methods of competition that fall within the established concepts of unfairness embodied in the antitrust laws and related common-law principles. Here, Defendants deliberately structured a commercial arrangement to foreclose a specifically identified competitor and tandemly acquired property for the purpose of blocking competitive entry with using the regulatory process as an instrument of commercial delay.

That conduct is not merely technical or arguably unfair. It is the paradigmatic unfair method of competition: using contractual incentives, control of scarce real estate, and baseless regulatory opposition to preserve an incumbent's exclusive access to a lucrative market. Unlike a case in which the alleged injury depends upon speculation about a hypothetical entrant, MJ's was the selected second HCA candidate. MJ's was not hypothetical and its entrance into the marketplace was - by Defendants own calculation - going to cause deep financial injury to Defendants. The opportunity to compete was real, authorized, and already in motion. The unfair competition interfered with and deprived MJ's of its rights and entitlements in its HCA and permits and ultimately toppled MJ's business entirely.

**VI. This Case Does Not Necessitate Review of Defendants' Petitioning Activity under Noerr-Pennington**

Defendants cannot transform a private commercial conspiracy into protected petitioning simply because part of the campaign later passed through governmental bodies. The core conduct

occurred outside the petitioning process: the “dead lease” site and the $10 million contractual incentive were private commercial acts. Those acts stand independently of any First Amendment issue.

Moreover, the subsequent petitioning campaign was not an isolated regulatory disagreement. Nature’s Remedy began the campaign before the merger; Jushi continued it after the merger through the same counsel and with the same substantive objections and, more pertinently under the Term Sheet and Due Diligence requirements shared by the Defendants. The timing of the objections and zoning appeal corresponded with the milestones governing the $10 million payment, and Defendants voluntarily dismissed the appeal once those milestones had been secured. The record therefore shows a single, continuous exclusionary strategy—not independent acts of legitimate regulatory participation.

Even if the Court examines each petitioning act, every one of them was objectively and subjectively baseless. Defendants admit they lacked any zoning-related harm on which to base any legally cognizable standing and the decisions they were challenging and ultimately appealed were discretionary determinations reviewable only under an abuse of discretion standard. The record before the Planning Board and ZBA more than adequately supported decisions in MJ’s favor and Defendants never offered any evidence at any hearing before any board contradicting MJ’s engineer-stamped plans or otherwise supplying any basis for their objections.

The sequence of events reveals the true reason for Defendants’ objections and for the Zoning Appeal. Defendants tracked the competitors based on whether their competitive entry would be within the crucial cross-border zone competing for New Hampshire retail traffic. Defendants blocked one competitor planning a facility in that zone with a “dead lease.” When the Town chose MJ’s for the second HCA, within a week Defendants inserted a term into the merger

agreement conditioning $10million of merger consideration on a competitor not opening within a 2,500-foot radius over two milestones during a 30-month period after the merger transaction closed. Immediately, Defendants commenced their petitioning campaign to challenge MJ's permits. The first challenge was to the Select Board itself, followed by objections to every board and finally with the Zoning Appeal, which Jushi voluntarily dismissed when the 30-month milestones were assured. Defendants' petitioning was obviously for the purpose of invoking the appeal process itself to delay MJ's entry into the market in accordance with the express provisions of Defendants' contractual restraint.

## VII. Even if the Court Concludes that a Full Rule-of Reason Analysis is Required, Defendants Cannot Establish They are Entitled to Summary Judgment on this Record

Although MJ's maintains that the Additional Merger Consideration provision warrants per se or quick-look treatment, the summary judgment record independently satisfies a conventional rule-of-reason case — much of it through evidence Defendants themselves generated. Accordingly, under that test there are genuine issues of material fact that preclude entry of summary judgment for the Defendants.

**WHEREFORE,** in light of the foregoing, detailed in MJ's accompanying Statement of Undisputed Material Facts (SOF), Summary Judgment Appendix, and Memorandum of Law, there is no genuine dispute of material fact concerning Defendants' liability under Count I (Sherman Act § 1) and Count III (G.L. c. 93A § 11). MJ's respectfully requests that the Court enter partial summary judgment in its favor on liability as to those counts, reserving damages and liability and damages on MJ's other for trial.

## LOCAL RULE 7.1(a)(2) CERTIFICATION

The undersigned counsel for MJ's certifies that counsel for Defendants has conferred with counsel for MJ's and has assented to the relief requested in this Motion.

Respectfully submitted,

MJ'S MARKET, INC.,
By its attorneys,

*/s/ Michael J. Duffy*
Law Office of Michael J. Duffy, PLLC
60 Washington Street, Suite 301
Salem, MA 01970
617-620-6157
mike@mjdlawyer.com

*/s/ Eric J. Kfoury*
Eric J. Kfoury, BBO #552572
6 Martin Ave
North Andover, MA 01845
978.758.9595
eric@kfourylawandconsulting.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent electronically to all counsel of record.

*/s/ Michael J. Duffy*