**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MJ'S MARKET, INC.,**<br>**Plaintiffs,**<br>**v.**<br>**JUSHI HOLDINGS, INC., et al.,**<br>**Defendants.** | **CIVIL ACTION NO. 4:23-cv-40037-MRG** |

# PLAINTIFF MJ'S MARKET, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1
II. UNDISPUTED FACTS ..... 1
III. ARGUMENT ..... 2
A. Summary Judgment Standard ..... 2
B. MJ's is Entitled to Partial Summary Judgment on its Sherman Action Section One Conspiracy to Restrain Trade Count Based on Defendants' Commercial Conduct ..... 2
1. The Merger Agreement and $10M Additional Merger Consideration Provision Constitute Concerted Action ..... 3
2. Defendants Deliberately Sought to Prevent Competitive Entry Into the Geographic Area Serving Their New Hampshire Customer Base ..... 4
3. The $10 Million Competitive-Entry Provision is a Naked Restraint of Trade ..... 7
a. Although the $10M Additional Merger Consideration Provision is Subordinate to the Defendants' Merger Transaction, it is not Reasonably Necessary to Achieving the Transaction's Purpose ..... 8
b. The "Dead Lease" and Surrounding Circumstances Confirm the Provision's Anticompetitive Purpose ..... 10
c. Concerted Exclusion Does Not Escape Section 1 Simply Because the Agreement Includes Conspirators in Different Market Positions ..... 10
d. The Restraint is Unlawful Under the Per Se Standard or, at Minimum, Warrants "Quick Look" Abbreviated Scrutiny ..... 11
e. Defendants' Witnesses Identified no Pro-Competitive Justifications for the Language ..... 12
4. The Restraint Caused MJ's the Competitive Injury the Antitrust Laws Prohibit ..... 14
C. MJ's is Entitled to Partial Summary Judgment on its Independent G.L. c. 93A § 11 Count Based on the Same Commercial Conduct ..... 15
1. Chapter 93A's Prescriptions Against Unfair Competition are Broad ..... 15
2. Defendants' Conduct Violated Chapter 93A Because it was Unfair, Unethical, Oppressive and Caused Substantial Injury ..... 16
3. Defendants' Actions Occurred Primarily and Substantially in Massachusetts and Caused MJ's Loss of Money and Property ..... 17
4. MJ's Chapter 93A Claim is not Subject to Certain Elements of Proof Required Under Federal Antitrust Law ..... 18
D. Noerr-Pennington Does Not Apply to Purely Commercial Conduct ..... 18
E. Alternatively, Defendants' Coordinated Petitioning Campaign Constitutes Sham Petitioning Stripped of Noerr-Pennington Immunity ..... 19

1. The Petitioning Campaign Was Coordinated Between Then-Separate Entities as Part of the Same Commercial Conspiracy ..........19
2. The California Motor Standard Applies to this Series of Petitions ..........20
3. Even Under the Stricter PREI Standard, Every Petition Was Objectively and Subjectively Baseless ..........22
a. The Objective Prong: Defendants Lacked Any Legally Cognizable Zoning Standing and Could not Prove the Authorizing Boards Abused their Discretion ..........22
i. Defendants' Lacked Standing to Appeal ..........22
ii. The Planning Board's and Zoning Board of Appeals' Decisions were Discretionary and Subject to an Abuse of Discretion Standard ..........23
b. The Subjective Prong: The Regulatory Process Was Weaponized as a Commercial Delay Tactic ..........25
F. Alternatively, if the Court Determines a Full Rule-of-Reason Analysis Applies, Genuine Issued of Material Fact Preclude Summary Judgment for the Defendants ......27
1. The Record Contains Ample Evidence of a Relevant Market, Market Power, and Anticompetitive Effects ..........27
2. Defendants' Expert's HMT Analysis, Fully Corrected, Confirms Rather Than Refutes a Narrow Market ..........28
3. Dr. Haruvy's Analysis of Defendants' Late-Disclosed Dutchie and Hoodie Sales Data Further Supports Market Power and Antitrust Injury ..........29
4. The Evidence Establishes Causation and Damages ..........29
III. CONCLUSION ..........30

## TABLE OF AUTHORITIES

### CASES

Allied Tube & Conduit Corp. v. Indian Head, 486 U.S. 492 (1988) ....................19
American Needle, Inc. v. NFL, 560 U.S. 183 (2010) ....................3
Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ....................2
Auburn v. Planning Bd. of Dover, 12 Mass. App. Ct. 998 (1981) ....................25
Aya Healthcare Servs. v. AMN Healthcare, Inc., 9 F.4th 1102 (9th Cir. 2021) ....................7, 8, 9
Barvenik v. Board of Aldermen, 33 Mass. App. Ct. 129 (1992) ....................23
Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 63 (2003) ....................24
Brown Shoe Co. v. United States, 370 U.S. 294 (1962) ....................7, 27
Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) ....................14
Cal. ex rel. Brown v. Safeway, Inc., 615 F.3d 1171 (9th Cir. 2010) ....................12
California Dental Ass'n v. FTC, 526 U.S. 756 (1999) ....................12
California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972) ....................20, 21
Ciardi v. F. Hoffmann-La Roche, Ltd., 436 Mass. 53 (2002) ....................15
Circle Lounge & Grille, Inc. v. Board of Appeal of Boston, 324 Mass. 427 (1949) ....................24
Cohen v. Zoning Bd. of Appeals of Plymouth, 35 Mass. App. Ct. 619 (1993) ....................24
Cooper v. Charter Communications Entm'ts I, LLC, 760 F.3d 103 (1st Cir. 2014) ....................16
Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984) ....................4
Davis v. Zoning Bd. of Chatham, 52 Mass. App. Ct. 349 (2001) ....................24
Epstein v. Bd. of Appeal of Bos., 77 Mass. App. Ct. 752 (2010) ....................23
Euromodas, Inc. v. Zanella, Ltd., 368 F.3d 11 (1st Cir. 2004) ....................2
Exhibit Source, Inc. v. Wells Avenue Business Center, LLC, 94 Mass. App. Ct. 497 ....................16
George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25 (1st Cir. 1970) ....................19
Growers 1-7 v. Ocean Spray Cranberries, Inc., No. 12-12016-RWZ, 2015 U.S. Dist. LEXIS 192538 (D. Mass. May 14, 2015) ....................2
Growers 1-7 v. Ocean Spray Cranberries, Inc., 2014 U.S. Dist. LEXIS 61654, 2014 WL 1764533 (D. Mass. May 2, 2014) ....................15
Gulf Oil Corp. v. Bd. of Appeals of Framingham, 355 Mass. 275 (1969) ....................25
Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc., 806 F.3d 162 (3d Cir. 2015) ....................21
Harvard Square Defense Fund, Inc. v. Planning Board of Cambridge, 27 Mass. App. Ct. 491 (1989) ....................23
In re National Football League's Sunday Ticket Antitrust Litig., No. ML 15-02668 PSG (SK), 2024 U.S. Dist. LEXIS 6373 (C.D. Cal. Jan. 11, 2024) ....................3
James L. Miniter Ins. Agency v. Ohio Indem. Co., 112 F.3d 1240 ....................17

Katin v. National Real Estate Information Services, No. 07-10882-DPW, 2009 U.S. Dist. LEXIS 31398 (D. Mass. Mar. 31, 2009)....................17

Kattar v. Demoulas, 433 Mass. 1 (2000)....................16

Kenner v. Zoning Board of Appeals, 459 Mass. 115 (2011)....................23

Kiss v. Bd. of Appeals of Longmeadow, 371 Mass. 147 (1976)....................25

Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959)....................11

L.A. Memorial Coliseum Comm'n v. National Football League, 726 F.2d 1381 (9th Cir. 1984)..8

Liu v. Amerco, 677 F.3d 489 (1st Cir. 2012)....................16

Marashlian v. Zoning Bd. of Appeals of Newburyport, 421 Mass. 719 (1996)....................24

Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215 (1st Cir. 2005)....................16

Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n, 952 F. Supp. 884 (E.D. Pa. 1997)....................17

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)....................2

MCR Labs, LLC v. Analytics Labs, LLC, No. 2584CV00260-BLS2, 2025 Mass. Super. LEXIS 935 (Oct. 21, 2025)....................17

Murchison v. Zoning Bd. of Appeals of Sherborn, 485 Mass. 209 (2020)....................23

Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma, 468 U.S. 85 (1984)12

Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284 (1985)....................11

PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593 (1975)....................16

P.R. Inc. v. P.R. Tel. Co., 48 F.3d 39, 44 (1st Cir. 1995)....................15

P.R. Tel. Co. v. San Juan Cable LLC, 874 F.3d 767 (1st Cir. 2017)....................21

Parikh v. Franklin Med. Ctr., 940 F. Supp. 395 (D. Mass. 1996)....................15

Primetime 24 Joint Venture v. National Broadcasting Co., 219 F.3d 92 (2d Cir. 2000)....................21

Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49 (1993).................... 20-21

Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656 (1961)....................11

Redstone v. Bd. of Appeals, 11 Mass. App. Ct. 383 (1981)....................24

Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210 (D.C. Cir. 1986)....................7, 9

SAS of P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39 (1st Cir. 1995)....................15

Scott v. Harris, 550 U.S. 372 (2007)....................2

Silver v. New York Stock Exchange, 373 U.S. 341 (1963)....................11

Solyndra Residual Tr., ex rel. Neilson v. Suntech Power Holdings Co., 62 F. Supp. 3d 1027 (N.D. Cal. 2014).................... 2-3

Standerwick v. Zoning Bd. of Appeals of Andover, 447 Mass. 20 (2006)....................23

Sweenie v. A.L. Prime Energy Consultants, 451 Mass. 539 (2008)....................23

Tanaka v. Univ. of S. Cal., 252 F.3d 1059 (9th Cir. 2001)....................3
United States v. Addyston Pipe & Steel Co., 85 F. 271 (6th Cir. 1898), aff'd, 175 U.S. 211 (1899)....................7
United States v. General Motors Corp., 384 U.S. 127 (1966)....................10
United States v. Topco Assocs., 405 U.S. 596 (1972)....................10
USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO, 31 F.3d 800 (9th Cir. 1994)....................21
Vázquez-Ramos v. Triple-S Salud, Inc., 55 F.4th 286 (1st Cir. 2022)....................14
Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27, 728 F.3d 354 (4th Cir. 2013)....................21
White Motor Co. v. United States, 372 U.S. 253 (1963)....................7, 9
Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100 (1969)....................14

**STATUTES AND RULES**

15 U.S.C. § 1....................2
Fed. R. Civ. P. 56(a)....................2
G.L. c. 93A, § 2....................15
G.L. c. 93A, § 11....................1, 15, 18, 30

**OTHER AUTHORITIES**

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) ¶¶ 1905, 1906a, 1911, 1914....................7, 9, 12
Gilleran, Michael C., Law of Chapter 93A, 52 Mass. Prac. § 4.12....................15-16
Gilleran, Michael C., The Law of Chapter 93A § 4:9 at 111 (1989)....................17

## I. INTRODUCTION

This case arises from Defendants' effort to preserve their exclusive access to a two-license cannabis retail market that Defendants themselves identified as critical to capturing cross-border customer traffic from New Hampshire — traffic that comprised roughly 84% of Nature's Remedy's Tyngsborough revenue. The summary judgment record establishes, largely through Defendants' own contemporaneous documents, every element of MJ's liability case: a documented pre-merger strategy to foreclose competitive entry into that corridor, an unusual $10 million contract provision that paid Defendants' sellers only if no competitor opened nearby, a leasehold acquired for the sole purpose of denying real estate to a rival, and a calculated, coordinated campaign of baseless objections and litigation timed to run out the clock on that provision.

MJ's is entitled to partial summary judgment on liability through two independent pathways. First, the $10 Million Additional Merger Consideration provision is a naked horizontal restraint of trade that is unlawful under the per se rule or, at minimum, warrants abbreviated "quick look" scrutiny — a fact corroborated by Defendants' own witnesses who have identified no procompetitive justification for it. Second, that same commercial conduct independently violates G.L. c. 93A's broader prohibition on unfair methods of competition. Even if the Court declines summary judgment under either standard and instead requires a full rule-of-reason analysis, the summary judgment record — including Defendants' own expert's methodology, once correctly applied — establishes genuine disputes of material fact on every element of that analysis, precluding summary judgment for Defendants. MJ's therefore respectfully requests partial summary judgment on liability as to Count I (Sherman Act § 1) and Count III (G.L. c. 93A § 11), with damages reserved for trial.

## II. UNDISPUTED FACTS

MJ's refers the Court to its Statement of Undisputed Facts ("SOF") for a recitation of the detailed factual background for its Motion for Partial Summary Judgment. References and citations to facts appear within MJ's argument section.

## III. ARGUMENT

### A. Summary Judgment Standard

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Growers 1-7 v. Ocean Spray Cranberries, Inc*., No. 12-12016-RWZ, 2015 U.S. Dist. LEXIS 192538, at *10 (D. Mass. May 14, 2015). The Court views the record in the nonmovant's favor and draws justifiable inferences accordingly. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). Once the movant meets its burden, the nonmovant must identify "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 n.10, 587 (1986). A mere factual dispute does not defeat a properly supported motion, and the Court should not credit a version of events "blatantly contradicted by the record." *Growers 1-7*, 2015 U.S. Dist. LEXIS 192538, at *10; *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. MJ's is Entitled to Partial Summary Judgment on its Sherman Action Section One Conspiracy to Restrain Trade Count Based on Defendants' Commercial Conduct

Section 1 of the Sherman Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. To establish a Sherman Act Section 1 claim, a plaintiff must show: (1) that there was concerted action (e.g., a contract, combination or conspiracy) between two or more independent legal entities; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; *Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 16 (1st Cir. 2004) and (3) that the restraint affected interstate commerce." *Solyndra Residual Tr., ex. rel. Neilson v. Suntech Power Holdings Co, Ltd.*, 62 F.

Supp. 3d 1027, 1039 (N.D. Cal. 2014), *quoting*, *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001). Additionally, the plaintiff must have antitrust standing, meaning "they are the proper parties to bring the antitrust action because they were harmed by the concerted action and the harm suffered was caused by the anti-competitive aspect of the defendants' actions. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig*., No. ML 15-02668 PSG (SK), 2024 U.S. Dist. LEXIS 6373, at *5 (C.D. Cal. Jan. 11, 2024).

MJ's has established each of these elements by undisputed facts and is entitled to judgment on liability as a matter of law. The evidence demonstrates that Defendants' Merger Agreement expressly includes a plainly naked anticompetitive restraint. Section 1 prohibits unreasonable restraints, not merely restraints that produce a particular amount of measurable economic harm. Where the restraint is naked and plainly anticompetitive, MJ's need not establish the full market-power/market-effects case required under a conventional rule-of-reason analysis. Accordingly, application of a per se or abbreviated rule-of-reason ("quick look") standard is appropriate here.

**1. The Merger Agreement and $10M Additional Merger Consideration Provision Constitute Concerted Action**

The "contract, combination, or conspiracy" element of MJ's Section 1 claim is established by the Merger Agreement and, more precisely, the Additional Merger Consideration provision and the parties' negotiation of that language. *American Needle, Inc. v. NFL*, 560 U.S. 183, 189-92 (2010). The summary judgment record also establishes that the Defendants were independent economic actors at the time the agreement was negotiated and formed. SOF at 62, 67-81, 99-100. The proposal of the $10M contingent provision was not unilateral conduct – it was a negotiated contractual term between arms-length parties incorporated into the Merger Agreement. *Id*. at 195-

97; *see also Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752 (1984).[1] Prompted by the Select Board's selection of MJ's for the one remaining Host Community Agreement (HCA). SOF at 65-67, the Defendants, as distinct parties, memorialized a binding term that conditioned the merger transaction consideration on the continued absence of competitive entry within a protected geographic area for a specified term of 30-months. SOF at 74. This was not merely a statement of intent, internal policy, or unilateral refusal to deal. It was a multi-party agreement to insulate a geographic market and share economic consequences. The record establishes concerted action with direct evidence and without the need for circumstantial facts.

**2. Defendants Deliberately Sought to Prevent Competitive Entry Into the Geographic Area Serving Their New Hampshire Customer Base**

The undisputed facts demonstrate that Defendants intentionally agreed to block competitive entry into a specific, narrow geographic corridor essential to controlling their cross-border New Hampshire customer base. Defendants recognized the strategic value of their Route-3 border location and from the very beginning, actively tracked the three applicants for Tyngsborough's second and remaining HCA. SOF at 15-39. Internal documents reveal that Jushi distinguished its true competitors by whether their proposed location would be within the strategically important Route 3/New Hampshire-border area. Two possible competitors proposed sites within that zone: Nova Farms, with a location within approximately 500 feet and slightly north of Nature's Remedy's location, and MJ's, with a site several hundred feet south and across the street from Nature's Remedy's location. Jushi concluded Sanctuary Medicinals' proposed site,

---

[1] The Court's decisions in *Copperweld Corp*., 467 U.S. 752, and *American Needle, Inc.*, 560 U.S. 183, support the conclusion that Section 1's concerted-action requirement turns on whether the agreement joins "separate economic actors pursuing separate economic interests", i.e., independent centers of decision-making, not on whether the contracting parties compete with each other. Defendants were not required to be horizontal rivals of each other for there to be an actionable "agreement" under Section 1.

approximately a mile south of Nature's Remedy store, would serve a different customer base, not including the New Hampshire border traffic. SOF at 15-30. Jushi's economic modeling quantified the significance of competitive entry in the cross-border corridor, initially modeling a 50% reduction in top line revenue and later a 25% reduction in a "base" case and 50% reduction in a "downside" case. SOF at 77. Defendants (particularly Jushi) understood that the competitive threat was geographically specific to the immediate cross-border area and consequently acted to prevent only those competitors that threatened competition within this narrow zone - namely Nova Farms and MJ's.

Defendants took Nova Farms out by obtaining a "dead lease" for Nova's proposed 425 Middlesex Road site. In fact, Jushi's internal documents specifically proposed "intervening" and obtaining a "dead lease . . . blocking potential competition. . . ." SOF at 36-56 The due diligence checklist the Defendants used for the merger contained an item "3.7" that allocated responsibility for reaching out to and negotiating with the owner of the 425 Middlesex Road site to Nature's Remedy. SOF at 40. True to form, on March 3, 2021 – the same day that MJ's and Sanctuary submitted RFQs and one day before Nova Farms' submission, - Nature's Remedy's CEO John Brady signed the "dead lease" for the property. SOF at 50, 57.

The economics of the lease are telling: totaling nearly $1.75M ($249,600 average annual rent over five years plus a $500,000 mandatory relocation fee), all guaranteed by Nature's Remedy and subsequently assumed by Jushi; (SOF at 50-54) making it the highest cost leasehold space in Nature's Remedy's Massachusetts portfolio (4x Jushi's Offices and 2.5x its cultivation facility). SOF at 52-53. Contemporaneous Jushi internal communications indicate the purpose of the lease was to prevent competition.[2] Thus, before the Select Board had chosen the HCA candidate,

---

[2] Defendants' witnesses have attempted to backfill the "dead lease" with business rationales that do not square with the contemporaneous documents and circumstances surrounding the lease. Although John Carr testified that Nature's

Defendants had already committed to spend substantial money to block a strategically located competitor's site.[3]

When the Select Board chose MJ's for the second HCA (SOF at 60, 65-66), contrary to Defendants' apparent expectation, Defendants shifted focus and immediately began their coordinated effort to block MJ's proposed dispensary. *Id*. at 67. First, Nature's Remedy's counsel wrote to the Select Board objecting to MJ's selection and requesting the Board reconsider its decision and choose Sanctuary instead because it was "a much more suitable spot" that would "allow both businesses to thrive versus having two of the same types of stores adjacent to one another." In this letter, Nature's Remedy stated the true essence of its objection – having two dispensaries next to each other would hurt their business. *Id*. at 66. The next step was to incentivize the blocking of MJ's itself by inserting the "Additional Merger Consideration" language into the Defendants' already substantially negotiated agreement. The provision carved $10M out of the $110M transaction price and conditioned its payout on whether a "Tyngsborough Competitor" opened within 2,500 feet from Nature's Remedy's location. Clearly "Tyngsborough Competitor" was a substitute term for "MJ's Market" – the one possible competitor following the Select Board's vote. SOF at 74-79.

---

Remedy contemplated moving its location from 420 to 425 Middlesex Road, his testimony makes little sense. Nature's Remedy owned the 420 Middlesex Road site and had just months before completed its ground up construction of a new building. Additionally, the 425 Middlesex Road site was an undersized lot of only approximately 27,000 square feet (approximately ⅓ the required 80,000 square feet). Carr testified that he was unaware of that fact. MJ's undersized lot, according to Defendants, was an insuperable zoning barrier sufficient to merit the Zoning Appeal. Defendants' witnesses also testified that the 425 Middlesex Road site was not entirely unused—they claim to have used it for storage or parking, uses plainly inconsistent with the rent premium Defendants paid. SOF at 54-56.

[3] Suitable cannabis store locations in Tyngsborough were limited to the B3 zone. The B3 zone is concentrated along Middlesex Road, most in the area closest to the New Hampshire border. SOF at 2. According to Jushi's analysis, only the northern-most B3 zone was competitive for New Hampshire cross-border traffic. Candidates for HCAs identified three sites in this part of the B3 zone: Nature's Remedy at 420 Middlesex Road, Nova Farm's (succeeding Royalty Group) at 425 Middlesex Road (which Defendants blocked) and MJ's at 405-409 Middlesex Road. SOF at 57-58. No candidate for an HCA was ever selected for a proposal at a site that was not in this narrow zone. In fact, after MJ's HCA expired during the delay Jushi's Zoning Appeal caused, the Town issued an HCA to Yellow House Cannabis, LLC, which developed a nearly identical facility to MJ's proposed facility on the same site. SOF at 117-23.

Defendants' subsequent regulatory challenges continued Defendants' efforts to prevent or delay MJ's entry into the market. In August 2021, Defendants began objecting to MJ's special permit application. That next month, the Defendants closed the Merger Agreement transaction and both Nature's Remedy and Jushi continued the same opposition to MJ's entry both before the Planning Board and the Zoning Board of Appeals ("ZBA"). In October 2021, Jushi filed objections at the ZBA and Planning Board through the same counsel who had represented Nature's Remedy, raising the same substantive objections previously advanced by Nature's Remedy. SOF at 81-98, 101.

**3. The $10 Million Competitive-Entry Provision is a Naked Restraint of Trade**

Defendants' $10M Additional Merger Consideration provision constitutes a naked horizontal restraint arrangement designed solely to stifle competition. *See White Motor Co. v. United States*, 372 U.S. 253, 263 (1963)(a restraint is naked if it has "no purpose except stifling of competition"); *Brown Shoe Co. v. United States*, 370 U.S. 294, 335 (1962) ("the acquisition of Kinney by Brown resulted in a horizontal combination at both the manufacturing and retailing levels of their businesses"). The provision does not qualify for lower scrutiny under the "ancillary restraints" doctrine because it fails to meet the two necessary requirements for such treatment: that the restraint must be (1) "subordinate and collateral to a separate, legitimate transaction," *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986), and (2) "reasonably necessary" to achieving that transaction's pro-competitive purpose. *See United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898), aff'd, 175 U.S. 211 (1899); *Aya Healthcare Servs. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021); *see also* Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 1905 (discussing *Addyston Pipe & Steel Co.*).

a. **Although the $10M Additional Merger Consideration Provision is Subordinate to the Defendants' Merger Transaction, it is not Reasonably Necessary to Achieving the Transaction's Purpose**

There is no dispute that the $10M Additional Merger Consideration provision is subordinate to the Defendants' merger transaction. Jushi was entitled to acquire Nature's Remedy and protect its legitimate economic value. The provision is not, however, ancillary merely because it is a part of that agreement. Conditioning $10M of the purchase price on the absence of competitive entry into the market was not "reasonably necessary" to accomplish the merger's purpose. *Aya Healthcare Servs*., 9 F.4th at 1109, *citing, L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984) ("some agreements which restrain competition may be valid if they are 'subordinate and collateral to another legitimate transaction and necessary to make that transaction effective'").

The timing of Jushi's addition of the $10M Additional Merger Consideration provision to the transaction demonstrates that it was not necessary to make the transaction effective. The terms were only introduced in a draft dated March 30, 2021 – about a week after the Select Board had chosen MJ's for the second HCA. Prior to that, Defendants had exchanged numerous drafts of the Merger Agreement that were substantially complete and contained no such provision. SOF at 62-74. There is no indication that addition of the term was propelled by any legitimate risk allocation necessary to the deal. Its timing and operation indicate it was added as a direct response to a competitive threat.

Defendants' labeling of the provision as an "earnout" does not determine whether it was ancillary. A conventional earnout measures some performance-related metric (*e.g.*, EBITDA, revenue, customer retention). This one did not condition additional consideration on the performance of the acquired business but, rather, was triggered solely by market exclusion of a

competitor from a very specific geographic area. It conditioned consideration on the continued absence of the one and only Tyngsborough Competitor authorized by the Town, i.e., MJ's Market.

The restraint was also not reasonably tied to preserving goodwill. Preventing competition does not equate to protecting goodwill. A restraint does not become ancillary merely because the restrained competition would reduce the profitability of the acquired business. If that were the measure, virtually any exclusionary restraint benefitting the acquired business could be deemed protection of goodwill. A leading treatise states that the principal criteria for determining whether a restraint is ancillary are the following:

> (1) A restraint is ancillary if it somehow makes the market more competitive by facilitating the creation of a new product or process, enabling new entry, or expanding output.
> (2) If a restraint is not ancillary in this sense, but in fact diminishes competition, then it is not the court's prerogative to determine whether the "amount" of restraint is justified by special circumstances in the defendant's market.

Antitrust Law, *supra* at 1905 (discussing *Addyston Pipe & Steel Co.*). The restraint at issue here does nothing to make the market more competitive and, therefore, there is no reason for the Court to entertain whether any other justification for it exists under Defendants' rationale.

"'Naked restraints" are categorically not "ancillary restraints.'" *Aya Healthcare Servs.*, 9 F.4th at 1109, *quoting, Rothery Storage*, 792 F.2d at 224 n.10. "[N]aked horizontal restraints are always analyzed under the per se standard." *Id*. The Defendants $10M Additional Merger Consideration provision is an agreement that has no purpose except stifling competition and, therefore, qualifies for per se treatment. *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963); *see also* Antitrust Law, *supra* at P 1906a ("[o]nce a restraint is classified as 'naked,' condemnation follows almost as a matter of course, most often without elaborate inquiry into power or actual effects and with only a several limited recognition of defenses."). "[T]he Court has consistently rejected the notion that naked restraints of trade are to be tolerated because they

are well intended or because they are allegedly developed to increase competition." *United States v. Topco Assocs*., 405 U.S. 596, 610 (1972), *citing, United States v. General Motors Corp*., 384 U.S. 127, 146-147 (1966). Defendants have no such justification here and no reason appears to treat the Defendants' $10M Additional Merger Consideration any differently from other anticompetitive agreements that receive per se treatment.[4]

b. **The "Dead Lease" and Surrounding Circumstances Confirm the Provision's Anticompetitive Purpose**

Jushi actively tracked HCA applicants, targeting Nova Farms' and MJ's due to their locations within the immediate Route 3 cross-border corridor, while ignoring Sanctuary's location, which was outside the corridor and would serve a different population from the New Hampshire border traffic. Jushi modeled significant revenue consequences based on competition in its immediate corridor (reduction of between 50 and 25%). Defendants acted on that knowledge and strategy. They coordinated to obtain the "dead lease" to block Nova Farm's competitive entry at a significant, over-market cost. Then, - apparently, unexpectedly for Defendants - the Select Board voted to award MJ's the second HCA and changed the situation. Within a week of the vote, Defendants introduced the $10M Additional Merger Consideration language, which targeted the same geographic area in which Nova Farms had proposed locating. Defendants continued to pursue the strategy their deal documents and prior actions had detailed. They objected to MJ's HCA selection and MJ's permits and authorizations before each and every Board and, after the deal closed, Jushi continued those objections and filed the Zoning Appeal.

c. **Concerted Exclusion Does Not Escape Section 1 Simply Because the Agreement Includes Conspirators in Different Market Positions**

[4] Although this agreement does not fall into a traditional per se category – such as price fixing, group boycotts, or classic market allocation – it poses an equally obvious, facially anticompetitive threat with an explicit exclusionary purpose. Consequently, it warrants classification as a naked restraint and close analogue to per se illegal horizontal agreements.

Section 1 liability for conduct aimed at excluding a competitor does not require the excluding parties be horizontal rivals of each other actively competing in a market. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 213 (1959). In *Klor's, Inc.*, a department store combined with manufacturers and distributors – parties in a vertical, not horizontal, relationship – to cut off supply to Klor's, a competitor of the department store. The Court treated that as a per se unlawful boycott even though most of the conspirators were not Klor's competitors and Klor's was not a party to any agreement. *Id.*; *see also Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 659-61 (1961)(refusal to supply gas for burners not marked with market competitor's seal of approval violated antitrust statues); *Silver v. New York Stock Exchange*, 373 U.S. 341, 361-67 (1963)(decision of members of the stock exchange to discontinue plaintiff's wires without justification constituted violation of the Sherman Act). These authorities, among others, stand for the proposition that concerted action by a group to put a competitor out of business, or impair its ability to compete, is actionable even where the conspirators' relationship to each other is not horizontal in the form of, for example, direct competitors within a market agreeing to fix prices.[5]

#### d. The Restraint is Unlawful Under the Per Se Standard or, at Minimum, Warrants "Quick Look" Abbreviated Scrutiny

If the Court is not prepared to apply a per se rule to Defendants' agreement, it should apply "quick look" scrutiny. "[A]n arrangement is violative of § 1 under a quick look approach when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."

[5] The Court's holding in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co*., 472 U.S. 284 (1985), does not materially change the analysis. MJ's is not alleging the agreement at issue here strictly constitutes a group boycott. It constitutes a naked restraint due to its clear aim to restrain trade and also because it does not qualify as an ancillary restraint under the authorities cited above. Where it is not ancillary, it is a naked restraint. This question does not depend on the horizontal contracting relationship between parties.

*California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999). "Quick look review is not necessarily based on a history of rule of reason adjudications; rather, it asks whether 'a great likelihood of anticompetitive effects can easily be ascertained' by examining the restraint, and considering defendants' justifications of it." *Cal. ex rel. Brown v. Safeway, Inc*. 615 F.3d 1171, 1178 (9th Cir. 2010), *quoting*, *California Dental Ass'n, 526 U.S. at 770; see also* Antitrust Law, *supra* at 1911 ("quick look" is appropriate "when the restraint is sufficiently threatening to place it presumptively in the per se class, but lack of judicial experience with a significant element requires at least some consideration of proffered defenses or justifications").

Like per se review, a "quick look" ordinarily does not require empirical evidence of anticompetitive effects. *See Cal. Dental Ass'n*, 526 U.S. at 779-81 (explaining that the "quality of the proof required should vary with the circumstances;" that "naked restraint[s] on price and output need not be supported by a detailed market analysis in order to" move to the second step of the quick look analysis and "require" defendants to produce "some competitive justification"; and that not "every case attacking a less obviously anticompetitive restraint . . . is a candidate for plenary market examination")(citations, internal quotation marks omitted); *see also Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 109-110 (1984). Here, the "likelihood of anticompetitive effects can easily be ascertained," and the burden of proof shifts to the defendants "to show empirical evidence of procompetitive effects." *See Cal. Dental Ass'n*, 526 U.S. at 770, 775 n.12; Antitrust Law, *supra* at 1914 (where "the restraint is of such a character that an anticompetitive effect may be presumed," "the only tolerance permitted to the defendant is to show that what seems to be a per se unlawful restraint actually does, in this particular case, lead to increased output or reduced prices").

e. **Defendants' Witnesses Identified no Pro-Competitive Justifications for the Language**

Defendants have put forward no plausible procompetitive effects to overcome the great likelihood of anticompetitive effects that would result from the $10M Additional Merger Consideration provision.[6] Defendants closely monitored the competitive threats to Nature's Remedy and Jushi identified nearby competition as a major economic threat (causing a slash of between 50% and 25% of revenue) for the Tyngsborough store. Defendants took the extraordinary step of obtaining a "dead lease" so commercially unjustifiable under sound business practices that it could serve no economic purpose other than to exclude competition and preserve market position. Defendants treated Sanctuary differently because its location was a mile farther south and outside of what Jushi considered to be its competitive market. After the Town selected MJ's as the prevailing HCA candidate, the $10M Additional Merger Consideration language was added to the parties' deal. Consistent with that exclusionary intent, Defendants opposed MJ's entry into the market before every board having authority over its approval process. Defendants should not be permitted to convert a facially straightforward agreement nakedly restraining competitive entry

---

[6] John Brady, Sammartino's 30(b)(6) witness, testified as follows: "Q. Well, I'll just ask it this way: Do you contend -- does Nature's Remedy contend that any of its conduct in connection with competition in Tyngsborough had procompetitive effects? MS. KERNER: Objection. MR. BRANDWEIN: Objection. THE WITNESS: It did not. BY MR. DUFFY: Q. Okay. A. I think I'm answering it. I'm saying we didn't have procompetitive. Anything we did did not have procompetitive." SOF at 79 (p. 272).

Mr. Barrack, Jushi's 30(b)(6) witness, testified as follows: Q. Does Jushi contend that its filing of the zoning appeal had pro-competitive results in the Tyngsborough market or the market served by its Tyngsborough location? A. I don't think we made any contention related to the competitive impact of the zoning -- the zoning, whatever. The zoning thing. The anti-zoning thing. Q. Does Jushi contend that the additional merger consideration provisions of the MMIPA had pro-competitive results? A. I -- I don't -- I don't, like, quite understand the question. I think it's silent on competitive results. I think it's a regulatory trigger and a regulatory and operational trigger. Q. Is there -- do -- can you think of or do you contend, does Jushi contend in any way that those provisions helped competition? MS. DONOVAN: Objection, you can answer. THE WITNESS: I -- I mean, I -- MS. MCCALL: Objection to form. THE WITNESS: I think it's silent on the issue. BY MR. DUFFY: Q. And are you saying it's silent on the issue because there are no words within the document that speak to having such a result? A. No, I'm saying it's orthogonal to the issue so that whether or not we filed that zoning thing, we were going to face all sorts of competition, like we have, like we will, like there is and will be throughout Massachusetts and New Hampshire. SOF at 79 (pp.272-73).

into a conventional rule-of-reason case merely by asserting that they lacked market power or that MJ's cannot prove a complex relevant market. If the Court determines that some market-power and effects inquiry is required, MJ's addresses those issues alternatively below in Section F.

#### 4. The Restraint Caused MJ's the Competitive Injury the Antitrust Laws Prohibit

Defendants' $10M Additional Merger Consideration provision restraint caused precisely the harm to MJ's that the antitrust laws prohibit. MJ's was the actual, authorized prospective second licensee in a regulatory duopoly – not a speculative would-be competitor. MJ's HCA was specifically tied to the 405-409 Middlesex Road site. Defendants knew MJ's was the selected entrant and that it was advancing through the permit and approval process and moving toward developing its dispensary. Nothing stood in MJ's way except Defendants' restraint that was explicitly directed, by its own terms, to penalize exactly the event of MJ's competitive entry over a defined 30-month window. The injury MJ's suffered, being the target of a restraint designed to keep it out, is precisely the type of injury the restraint was designed to produce.

The injury that followed is directly connected to the feature of Defendants' contract that made their conduct unlawful. The $10M Additional Merger Consideration provision was directed at suppressing competitive entry. The steps Defendants took in furtherance of that conspiracy suppressed and delayed MJ's competitive entry into the market. The injury flows directly from what makes the Defendants' restraint unlawful. *See Brunswick Corp.*, 429 U.S. at 489 ("injury should . . . be 'the type of loss that the claimed violations… would be likely to cause''); *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125, 89 S. Ct. 1562, 1577 (1969)(injury alleged, exclusion from a market, "was precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause"); *Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 294 (1st Cir. 2022)( excluded competitor "is routinely the plaintiff that brings an antitrust complaint as the

party directly harmed by the elimination of competition in the foreclosed market”), *citing, SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 44 (1st Cir. 1995) (explaining that a presumptively proper plaintiff in an antitrust suit includes “a competitor who seeks to serve [a threatened] market”); *Clarett v. NFL*, 306 F. Supp. 2d 379, 398 (S.D.N.Y. Feb. 5, 2004)(holding plaintiff’s exclusion based on NFL rule flows directly from anticompetitive effects of the rule and constitutes antitrust injury).

**C. MJ’s is Entitled to Partial Summary Judgment on its Independent G.L. c. 93A § 11 Count Based on the Same Commercial Conduct**

**1. Chapter 93A’s Prescriptions Against Unfair Competition are Broad**

Chapter 93A is construed in harmony with the "interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act" ("FTCA"). G.L. c. 93A § 2. “The Supreme Judicial Court has explained that ‘[t]he Federal Trade Commission may, under § 5(a)(1) of the [FTCA], enforce the antitrust laws, including the Sherman Act and the Clayton Act, but it is not confined to their specific prohibitions.’” *Picone v. Shire PLC*, C.A. No. 16-cv-12396-ADB, 2017 U.S. Dist. LEXIS 178150, *44-46 (D. Mass. October 20, 2017), *quoting, Ciardi v. F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 59 (2002). The FTC “may bar incipient violations of those statutes,” as well as “‘conduct which, although not a violation of the letter or spirit of the antitrust laws, is nevertheless either an unfair method of competition, or an unfair or deceptive act or practice.’” *Id., citing, Parikh v. Franklin Med. Ctr.*, 940 F. Supp. 395, 406 (D. Mass. 1996) (“[a]ccording to the Supreme Court, § 5 of the [FTCA] may be used to ban conduct that infringes the spirit, or that constitutes an incipient violation, of the Sherman Act”); *see also Growers 1-7 v. Ocean Spray Cranberries, Inc.*, 2014 U.S. Dist. LEXIS 61654, 2014 WL 1764533, at *4 (D. Mass. May 2, 2014) (citation omitted) (“[a] plaintiff may bring a 93A claim even if it is unable to bring a statutory antitrust claim”); Michael C. Gilleran, Law of Chapter 93A,

52 Mass. Prac. at § 4.12 ("93A claims that satisfy neither the letter nor the spirit of the antitrust laws, as long as they establish an unfair method of competition or an unfair or deceptive act or practice, will establish a 93A claim"). In fact, the First Circuit has held that conduct that would not violate the Sherman Act because it was merely attempted and not successful still gives rise to a claim under Chapter 93A. *See Liu v. Amerco*, 677 F.3d 489, 494-95 (1st Cir. 2012)(holding conduct that would not violate Sherman Act Section 1, *i.e.*, attempted price fixing, violates FTC act and would also violate ch. 93A).

**2. Defendants' Conduct Violated Chapter 93A Because it was Unfair, Unethical, Oppressive and Caused Substantial Injury**

In considering whether a particular act or practice violates the unfairness prong of Chapter 93A, Massachusetts courts assess:

> (1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Cooper v. Charter Communs. Entm'ts I, LLC,* 760 F.3d 103, 111 (1st Cir. 2014), *quoting, Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 243 (1st Cir. 2005); *see also PMP Assocs., Inc. v. Globe Newspaper Co*., 366 Mass. 593, 596 (1975). An unfair practice may violate Chapter 93A even if it fails to violate the letter of a statute because the offending conduct falls within "the penumbra of a statute's concept of unfairness." *Id*. "Otherwise, there would have been no need for the [SJC] to refer to penumbras." *Id., citing, Kattar v. Demoulas*, 433 Mass. 1, 12-13 (2000) (holding that Chapter 93A "makes conduct unlawful which was not unlawful under the common law or any prior statute"). Under Section 11, business plaintiffs need only show that the conduct was within a recognized or established common law or statutory concept of unfairness. *Exhibit Source, Inc. v. Wells Avenue Business Center, LLC*, 94

Mass. App. Ct. 497, 501 (2018); *James L. Miniter Ins. Agency v. Ohio Indem. Co.*, 112 F.3d 1240, 1251 (1st Cir. 1997).

The conduct Defendants engaged in clearly violates the concept of fairness that falls within the penumbra of the Sherman Act, FTC Act and common law prescriptions against unfair methods of competition. *See Katin v. Nat'l Real Estate Info. Servs.*, No. 07-10882-DPW, 2009 U.S. Dist. LEXIS 31398, at *35 (D. Mass. Mar. 31, 2009)(offering of conveyancing services without license to practice law "allegedly gives rise to an '[i]njury to the marketplace . . . which . . . impairs the ability of a competitor to compete fairly'"), *quoting, Mass. Sch. of Law v. Am. Bar Ass'n*, 952 F. Supp. 884, 890-91 (D. Mass. 1997); *see also* Michael C. Gilleran, The Law of Chapter 93A § 4:9 at 111 (1989); *Cf. MCR Labs, LLC v. Analytics Labs, LLC*, No. 2584CV00260-BLS2, 2025 Mass. Super. LEXIS 935, at *14 (Oct. 21, 2025)(conduct, such as falsifying state cannabis lab testing reports to increase market share, could constitute "unfair methods of competition"). Specifically, Defendants engaged in commercial conduct with the naked intent to foreclose entry into the Tyngsborough market. The $10M Additional Merger Consideration provision is explicitly structured to penalize market entry of a specifically identified competitor and was introduced into the deal only after the Town had selected MJ's as the second HCA candidate. Defendants also weaponized property rights to eliminate competition in the narrow cross-border corridor adjacent to Nashua, New Hampshire by acquiring and maintaining a non-operational lease for 425 Middlesex Road, blocking Nova Farms from locating a dispensary there. Defendants' conduct is unquestionably willful and knowing.

**3. Defendants' Actions Occurred Primarily and Substantially in Massachusetts and Caused MJ's Loss of Money and Property**

The undisputed facts establish that Defendants' actions occurred primarily and substantially in Massachusetts. The direct result of Defendants' conduct was to delay and obstruct

MJ's development of a competing cannabis operation in Tyngsborough. The record demonstrates that Defendants' commercial agreements to prevent competition from entering the market were followed with further conduct demonstrating the intent of the $10M Additional Merger Consideration was explicitly to exclude competition. MJ's was delayed in pursuing its project by Defendants for more than two years, ultimately losing its HCA with the Town and its entire business enterprise.

#### 4. MJ's Chapter 93A Claim is not Subject to Certain Elements of Proof Required Under Federal Antitrust Law

MJ's Chapter 93A claim does not require the Court to grapple with certain specific elements of proof required under the federal antitrust statutes. Chapter 93A imposes no relevant market requirement: where conduct is facially exclusionary and designed to foreclose a competitor in a regulatory duopoly, the unfairness is complete upon execution of the conduct. Chapter 93A also imposes no antitrust injury requirement. It requires only a distinct business injury — a direct loss of money or property from the unfair conduct. MJ's loss of its business opportunity delayed (and obstructed) commercial opening, and increased capital expenditure navigating Defendants' artificially created obstacles constitute an undeniable, concrete business injury under § 11 regardless of any federal standing analysis. MJ's Chapter 93A claim thus functions as both a parallel track to its Sherman Act claims and an independent floor — even if the Court finds genuine disputes on any Sherman Act structural element, summary judgment on Chapter 93A liability is independently warranted on this record.

### D. Noerr-Pennington Does Not Apply to Purely Commercial Conduct

The undisputed evidence in the summary judgment record establishes that Defendants conspired to restrain trade through purely commercial conduct that did not involve any petitioning activity. *Noerr-Pennington* does not apply to Defendants' purely commercial conduct. *Noerr-*

*Pennington* is rooted in the First Amendment right to petition the government and is categorically inapplicable to private commercial real estate transactions and M&A agreements involving no protected First Amendment activity or government action. *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 33 (1st Cir. 1970)(*Noerr-Pennington* immunity does not apply to private commercial conduct, even when involving public bidding).

Defendants' conspiracy and agreement to secure a "dead lease" for the 425 Middlesex Road property blocking Nova Farms as a competitor from locating at that site, and the $10M Additional Merger Consideration clause are private commercial contracts that stand entirely outside the scope of *Noerr-Pennington* regardless of whether Defendants engaged in subsequent petitioning activity to block MJ's project. Defendants cannot escape antitrust liability for a broad commercial conspiracy simply because some elements later involved interaction with public officials. *See Allied Tube & Conduit Corp. v. Indian Head,* 486 U.S. 492, 502-05 (1988)(reasoning petitioning to non-governmental standard setting body does not benefit from *Noerr-Pennington* protection, even if it could have influenced government action)*; George R. Whitten, Jr., Inc.*, 424 F.2d at 33. Massachusetts courts apply the identical limitation to Chapter 93A claims — *Noerr-Pennington* cannot immunize purely private commercial torts. Summary judgment under Section 1 of the Sherman Act and G.L. c. 93A based on this commercial conduct is entirely independent of and unaffected by any First Amendment protections under *Noerr-Pennington* and any analysis of Defendants' sham petitioning.

### E. Alternatively, Defendants' Coordinated Petitioning Campaign Constitutes Sham Petitioning Stripped of *Noerr-Pennington* Immunity

#### 1. The Petitioning Campaign Was Coordinated Between Then-Separate Entities as Part of the Same Commercial Conspiracy

The Defendants' petitioning campaign satisfies the concerted action requirement of Section 1 of the Sherman Act through the same inter-entity coordination established above in connection with Defendants' purely commercial actions. Nature's Remedy filed its first administrative objection in March 2021 — before the merger agreement was signed, while the parties were under a Term Sheet and conducting due diligence and exchanging drafts, and while Blechner had already reported Brady's communication about locking up 425 Middlesex Road. SOF at 66. The petitioning campaign thus began while the conspiracy was actively forming between then-separate entities with aligned economic interests. After the Merger Agreement was signed, Jushi picked up the identical arguments post-merger and continued the campaign seamlessly — including filing the Superior Court zoning appeal. The same attorney represented Nature's Remedy and then Jushi before the same boards — a concrete, visible manifestation of institutional continuity across the handoff. Every argument raised by Nature's Remedy was raised identically by Jushi — this is not coincidental parallel conduct, it is a single continuous campaign executed by two entities in sequence. SOF at 81-98.

**2. The *California Motor* Standard Applies to this Series of Petitions**

The Supreme Court's decision in *California Motor Transport* establishes that a pattern or series of petitioning conduct can constitute a Sherman Act violation when used as an anticompetitive weapon — the series is evaluated holistically rather than each petition being assessed individually for objective baselessness. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S. Ct. 609, 613 (1972)("a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused").[7] "This inquiry asks whether a series of petitions were filed with or without regard to

---

[7] The First Circuit has not held that the stricter *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993), individual-petition standard applies to a series of petitions in preference to *California Motor*

merit and for the purpose of using the governmental process (as opposed to the outcome of that process) to harm a market rival and restrain trade." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc*., 806 F.3d 162, 180 (3d Cir. 2015)( pattern of appeals in real estate development process without regard to merit may constitute sham petitioning).[8] In determining whether Defendants' conduct reflects "a policy of filing petitions with or without regard to merit," the Court should look at the circumstances as a whole (*e.g.*, evaluating Defendants' filing success and circumstantial evidence of subjective motivations). *Id*. at 181 (four actions filed against plaintiff were not too few to qualify as a pattern or series).

Under *California Motor Transport*, evaluated holistically, Defendants' petitioning conduct was undertaken without regard to merit for the purpose of delay and to restrain competitive entry into the market. The petitioning activity involved a pre-merger petitioning campaign begun by Sammartino during due diligence in response to MJ's selection for the second HCA, was continued

---

*Transport* standard. The question was addressed in *P.R. Tel. Co. v. San Juan Cable LLC*, 874 F.3d 767, 773 (1st Cir. 2017), without an explicit holding by the Court that the *PREI* standard applies in all sham petitioning claims, whether addressing a single petition or a series. In fact, while Judge Kayatta's opinion for the Court in *P.R. Tel. Co.* expressed skepticism that "a defendant's willingness to file frivolous cases may render it liable for filing a series of only objectively reasonable cases," and essentially applied the PREI standard, the Court did not foreclose the *California Motor* standard in pattern cases. *Id*. at 771-72. Important to the Court's decision was the fact that the Court "assume[d]... all twenty-four filings" of the defendant were "objectively reasonable," because "the district court so found after examining each" of them and the plaintiff had "waived any challenge to those findings." *Id*. at 770. Thus, the First Circuit in *P.R. Tel. Co.* was confronted with facts concerning a pattern of petitions, but where each of them was "objectively reasonable." Judge Barron's concurrence in *P.R. Tel. Co.*, 874 F.3d at 773-78, in which judge Torruella joined, explicitly acknowledged that *California Motor* was not foreclosed, stating:

> We avoid doing so because we do not hold that the "objectively baseless" requirement for triggering the sham exception set forth in the single-petition case of [*Professional Real Estate Investors, Inc.*] necessarily applies to each and every case involving a pattern of petitioning. We instead rely on a more record-based, case-specific line of reasoning that, as I read our opinion, leaves open the possibility that, PREI notwithstanding, a monopolist might be liable under the antitrust laws for engaging in a pattern of petitioning, even though no single filing in that pattern is objectively baseless.

*Id*. at 773.

[8] The Third Circuit in *Hanover 3201 Realty, LLC* reconciled *California Motor Transport's* standard with the *PREI* standard by reasoning that they apply to different situations. "*California Motor* to a series of sham petitions and *Professional Real Estate* to a single sham petition." *Hanover 3201 Realty, LLC*, 806 F.3d at 179-80, *citing, Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 363-364 (4th Cir. 2013); *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 101 (2d Cir. 2000); *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994).

post-merger by Jushi with identical arguments that had already been rejected, was coordinated through the same counsel, and was timed to run the clock on a $10M contractual payout contingent on MJ's exclusion. In addition, every one of Defendants' objections and petitions was either denied or abandoned. Jushi voluntarily dismissed the last of the series of petitions, the Zoning Appeal, two years after it was filed and at a time where it was assured that the milestones under the $10M Additional Merger Consideration provisions were satisfied. SOF at 108. The pattern reflects a plain case of a series of petitions used as an anticompetitive weapon rather than a genuine exercise of the right to petition.

### 3. Even Under the Stricter *PREI* Standard, Every Petition Was Objectively and Subjectively Baseless

#### a. The Objective Prong: Defendants Lacked Any Legally Cognizable Zoning Standing and Could not Prove the Authorizing Boards Abused their Discretion

A petition is objectively baseless if no reasonable litigant could realistically expect success on the merits. Defendants, who were represented by sophisticated legal counsel, knew or should have known that their petitions were entirely lacking in merit from the outset because: (a) Defendants lacked standing rooted in any cognizable zoning-related injury to challenge Plaintiff's zoning approvals; and (2) Defendants could not demonstrate that the decisions of the Planning Board and Zoning Board of Appeals approving MJ's applications were "arbitrary and capricious" such that they could have been annulled by the Superior Court. Accordingly, any reasonable petitioner in Defendants' position would have known that their objections and the Zoning Appeal were objectively baseless.

##### i. Defendants' Lacked Standing to Appeal

Standing to challenge a zoning variance or special permit requires a concrete, legally cognizable zoning harm — not a generalized competitive concern.[9] Defendants' own testimony establishes they had no unique, palpable, or substantial zoning-related injury related to MJ's project. The Defendants testified that their objections and the zoning appeal were about "fairness" or "compliance" with the zoning bylaw. Robert Carr, testifying on behalf of the Sammartino Parties, stated that there was no harm to Nature's Remedy from MJ's allegedly not being 500 feet from Max's Country Golf and when asked what harm Nature's Remedy experienced from MJ's project being located on an undersized lot, he answered "It's just not right," and said "Yeah" in response to a question "It's just observance of the bylaw?" SOF at 102.

Jushi's 30(b)(6) witness echoed that same insufficient basis for Jushi's objections and the Zoning Appeal, testifying the harm resulting from MJ's project being built on an undersized lot was: "I mean, the harm in someone getting away with not following the rules." SOF at 102. A desire to "vindicate" or enforce the zoning code or ensure "fair and equal application" is unequivocally not a basis for standing. No party has a right to sue simply to vindicate the zoning code. *Sweenie v. A.L. Prime Energy Consultants*, 451 Mass. 539, 545 (2008)(the language of a

[9] To qualify as a "person aggrieved," Defendants must establish "an injury specific and particular to [them], and not a harm general to the community." *Epstein v. Bd. of Appeal of Bos*., 77 Mass. App. Ct. 752, 756 (2010). It must be an injury to a private right and must be special and different from the concerns of the rest of the community or the community as a whole. *See Barvenik v. Board of Aldermen*, 33 Mass. App. Ct. 129, 132 (1992) ("[A] plaintiff must establish – by direct facts and not by speculative personal opinion – that his injury is special and different from the concerns of the rest of the community."); *Harvard Square Defense Fund, Inc. v. Planning Board of Cambridge*, 27 Mass. App. Ct. 491, 492-93 (1989) (standing only arises from "a private right, a private property interest, or a private legal interest"). Additionally, the injury alleged must be to an interest the zoning code was designed to protect and must be "more than minimal or slightly appreciable." *Kenner v. Zoning Board of Appeals*, 459 Mass. 115, 121 (2011); *see also Standerwick v. Zoning Bd. of Appeals of Andover*, 447 Mass. 20, 27–28 (2006). Further, the alleged injury must be supported with "credible facts." *Murchison v. Zoning Bd. of Appeals of Sherborn*, 485 Mass. 209, 215 (2020) ("Speculation and conjecture are not evidence, and in any event, more than a 'minimal or slightly appreciable' harm is required"). Although claims of aggrievement are not to be viewed narrowly, plaintiffs are nevertheless required to "establish -- by direct facts and not by speculative personal opinion -- that [their] injury is special and different from the concerns of the rest of the community." *Murchison*, 485 Mass. at 215 ("'Quantitatively, the evidence must provide specific factual support for each of the claims of particularized injury,' and '[q]ualitatively, the evidence must be of a type on which a reasonable person could rely to conclude that the claimed injury likely will flow from the board's action'") (internal citations omitted).

bylaw is insufficient to confer standing without particularized zoning-related injury); *Cohen v. Zoning Bd. of Appeals of Plymouth*, 35 Mass.App.Ct. 619, 624 (1993)("[a] showing of more than a general civic interest in the enforcement of the zoning ordinance is required"). Only a "person aggrieved" can challenge a zoning decision by a zoning board of appeals or special permit granting authority. *See Marashlian v. Zoning Bd. of Appeals of Newburyport*, 421 Mass. 719, 721 (1996).

The real reason for Defendants' objections and the Zoning Appeal was to fight competition. This motive was outlined in Nature's Remedy's first letter to the Select Board, where its counsel raised concerns about competitive harm. Pure insulation from market competition is not a legally cognizable zoning grievance under Massachusetts law — it has never been and was not at the time of these petitions. *See Circle Lounge & Grille, Inc. v. Board of Appeal of Boston*, 324 Mass. 427, 430 (1949); *Redstone v. Bd. of Appeals*, 11 Mass. App. Ct. 383, 385 (1981)("[n]othing offered by the plaintiffs suggests that they had any grievance to nurse about the proposed use of [the] property other than wishing that a competing bank should not materialize on the next street corner").

**ii. The Planning Board's and Zoning Board of Appeals' Decisions were Discretionary and Subject to an Abuse of Discretion Standard**

Even if Defendants could have articulated some legitimate basis for standing, the determinations made by the Planning Board and Zoning Board of Appeals were discretionary determinations governed by an abuse of discretion standard. The relevant inquiry for a court on appeal of a discretionary land use approval is "whether, on the facts the judge has found, any rational board" could have reached the same conclusion that the local permitting authority reached. *Britton v. Zoning Bd. of Appeals of Gloucester*, 59 Mass. App. Ct. 63, 74 (2003). The Board's decision "cannot be disturbed unless it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary." *Davis v. Zoning Bd. of Chatham*, 52 Mass. App. Ct. 349, 355 (2001). This is a "highly deferential" standard. *Britton*, 59 Mass. App. Ct. at 74. Under this

standard, review of the local decision extends to the point where "no rational view of the facts the court has found supports the board's conclusion." *Id*. at 74-75. This analysis is "highly deferential" to the discretion of the Board. *Id*. The Court does "not concern [itself] with the wisdom of [the grant of a special permit]; [it] may review only its validity." *Kiss v. Bd. of Appeals of Longmeadow*, 371 Mass. 147, 154 (1976). If reasonable minds can reach differing conclusions from the evidence, the decision of the board must be upheld. *See Auburn v. Planning Bd. of Dover*, 12 Mass. App. Ct. 998, 999 (1981). To hold otherwise would eliminate the board's intended review. *See Gulf Oil Corporation v. Bd. of Appeals of Framingham*, 355 Mass. 275, 277-78 (1969).

Accordingly, in order to overturn them, Defendants would have been required to demonstrate that these decisions were not supported by substantial evidence and were "arbitrary and capricious." No reasonable petitioner in Defendants' positions could have believed they had any prospect of making such a showing on appeal.[10] In fact, every petition and objection Defendants lodged was denied and Jushi voluntarily dismissed the Zoning Appeal on the eve of summary judgment — consistent with the objective baselessness of these petitions.

**b. The Subjective Prong: The Regulatory Process Was Weaponized as a Commercial Delay Tactic**

---

[10] The issues Defendants raised in their Zoning Appeal complaint were the following: (1) the 500-foot buffer requirement between cannabis establishments; (2) the 500-foot buffer requirement between a cannabis establishment and an outdoor area of recreation for children; (3) the size of the lot; and (4) purported traffic impacts. Defendants' complaint conceded that the buffer zone requirement between its facility and MJ's proposed facility was met. MJ's plans submitted to the Planning Board contained its engineer's stamped plan and measurement that MJ's facility was more than 500 feet from Max's Country Golf, an alleged outdoor recreation area for children. The ZBA's determination found that MJ's proposal to change a non-conforming use to a conforming use was less detrimental than the existing use and was grounded in a specific provision of the Zoning Bylaw that the ZBA is charged to interpret and which interpretation was entitled to deference. Finally, the Planning Board had imposed a right-turn-only condition on MJ's project, demonstrating that it had considered traffic concerns and the Zoning Bylaw imposed no requirement for a traffic study. On the record before the Planning Board and ZBA, Defendants could have no reasonable expectation of demonstrating the boards' decisions were "arbitrary and capricious" and not supported by substantial evidence. SOF at 85-98, 102. Defendants must be evaluated on the objective standard of a reasonable multi-national company represented by sophisticated legal counsel. Jushi was not a typical neighborhood objector, unsophisticated in the legal requirements of a zoning appeal.

The subjective prong requires proof that Defendants did not genuinely care about the outcome of the petitioning but used the governmental process itself as an anticompetitive weapon to delay, harass, and interfere with a competitor. The $10M Additional Merger Consideration clause — a provision that financially incentivized the precise delay the petitioning campaign was designed to achieve – is documentary proof of subjective bad faith. Defendants added this provision to the Merger Agreement about a week after the Select Board chose MJ's as the second HCA candidate. Defendants had already blocked the other competitor proposing to locate a competing dispensary in that narrow cross-border corridor by obtaining the "dead lease" for 425 Middlesex Road and they tried to do the same with MJ's site. As discussed above, the additional clause itself was focused on that same narrow area, prescribing a 2,500-foot "prohibited radius," which Defendants knew at the time enveloped MJ's proposed site. The language was also structured around a 30-month milestone period during which MJ's opening of its facility would trigger the contingency, thereby contemplating an extended period of exclusion from entry.

Defendants' internal documents also demonstrate the financial incentives behind their weaponization of the petitioning process. Jushi's own modeling showed initially that Jushi expected a loss of 50% of top line revenue from the entry of a Tyngsborough competitor. Later analysis tempered that expectation to a range between 25% and 50% based on a "base case" and a "downside case." A severe negative revenue impact specifically at Defendants' Tyngsborough location that was generating approximately $30M in annual revenues — provides the quantified financial motive that drove the delay strategy. Preventing or postponing a competitor from entering the market was incredibly lucrative under Jushi's own internal calculus.

Accordingly, even if the Court considers the petitioning activity, MJ's is entitled to summary judgment. The undisputed evidence shows that no reasonable petitioner in Defendants'

position could have believed they would be successful on the merits of their zoning objections and appeal. Defendants had no standing for their challenges, and the decisions of the Planning Board and Zoning Board of Appeals were discretionary approvals, entitled to review under an abuse of discretion standard. Thus, even if Defendants could articulate some basis for standing, no petitioner in their position (particularly a sophisticated multi-national corporation represented by large law firms) could have believed they would prevail in overturning the boards' decisions. Furthermore, the evidence demonstrates that Defendants petitioning activity was subjectively baseless and motivated by a desire to use the process to impose delay. Defendants' timeline of petitioning activity overlaps almost exactly with the passage of the milestones outlined in the $10M Additional Merger Consideration language. When it was assured that the milestones would be met, Jushi and its real estate subsidiary voluntarily dismissed their appeal. Defendants never raised any objection to Yellow House Cannabis, LLC's proposed development, notwithstanding that it proposed essentially the same facility on the same "undersized lot" with the same distances and purported traffic impacts.

### F. Alternatively, if the Court Determines a Full Rule-of-Reason Analysis Applies, Genuine Issues of Material Fact Preclude Summary Judgment for the Defendants

Although MJ's maintains that the Additional Merger Consideration provision warrants per se or quick-look treatment, the summary judgment record independently satisfies a conventional rule-of-reason case — much of it through evidence Defendants themselves generated.

#### 1. The Record Contains Ample Evidence of a Relevant Market, Market Power, and Anticompetitive Effects

MJ's experts, Dr. Ernan Haruvy and Robert Hunt, independently conclude that the Tyngsborough corridor surrounding 405 and 420 Middlesex Road is a distinct geographic market under *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Dr. Haruvy's analysis of Jushi's

own internal customer data shows Nature's Remedy's Tyngsborough store draws 83.9% of its visits from New Hampshire along the Route 3 corridor, with a 100% modeled overlap and 57.6% simulated diversion to Nature's Remedy from MJ's proposed site — compared to under 39% for any other competitor. SOF at 125. Mr. Hunt corroborates this through the "practical indicia" framework: the Town's zoning bylaw capped the market at two clustered retailers, and Jushi's own transaction documents defined a 2,500-foot "Prohibited Radius" and tied contingent consideration to competitive entry within it. SOF at 124. These are the market boundaries Defendants themselves drew and priced.

Market power follows directly from that structure: Nature's Remedy operated as the sole licensed retailer in a market capped at two for nearly three years. SOF at 124. Dr. Haruvy's econometric analysis quantifies the resulting exercise of that power — competitive sensitivity to an adjacent rival would increase roughly sevenfold, and Nature's Remedy's sustainable markup would fall by approximately 86%, absent MJ's exclusion. SOF at 125. The same analysis shows anticompetitive effects: Dr. Haruvy's HMT and duopoly-pricing framework concludes that excluding MJ's allowed Nature's Remedy to sustain markups it otherwise could not, producing higher prices and reduced choice — corroborated by a paired-product comparison showing Tyngsborough customers paid $7.50-$8.50 more than Nature's Remedy's identical Millbury products, differences that supply-side costs cannot explain because both stores are operated by the same firm. SOF at 125. This evidence establishes, at minimum, genuine disputes of material fact on each rule-of-reason element.

### 2. Defendants' Expert's HMT Analysis, Fully Corrected, Confirms Rather Than Refutes a Narrow Market

Defendants' expert, Peter Boberg, agrees that geographic market is properly tested by whether a hypothetical monopolist could profitably impose a small but significant price increase,

and endorses the standard critical-retention-ratio formula, CRR = t/(t+M). SOF at 98. His application of that formula, however, rests on three errors: (1) a margin drawn from an unrelated MJ's Market facility rather than Nature's Remedy's own 46.7% Tyngsborough margin; (2) a base diversion percentage calculated on gross rather than net revenue; and (3) an adjustment denominator built from MJ's Market's company-wide sales rather than its Tyngsborough-specific sales. Correcting all three, using Boberg's own methodology and data, yields an adjusted diversion range of 17.71%-20.06% — which exceeds the critical retention ratio required to make a SSNIP profitable across the full 5%-10% range tested (9.67%-17.65%). SOF at 102. Applying Boberg's own endorsed test to correctly calculated inputs therefore confirms, rather than refutes, the narrow geographic market MJ's experts identify — at minimum a textbook genuine dispute of material fact precluding summary judgment on this element. *Id*.

**3. Dr. Haruvy's Analysis of Defendants' Late-Disclosed Dutchie and Hoodie Sales Data Further Supports Market Power and Antitrust Injury**

Boberg's report treats Yellow House's 2025 entry as a "natural experiment" disproving market power, but grounds that analysis in Dutchie and Hoodie Analytics data that Defendants did not produce until after the close of discovery and after MJ's experts had already served their reports. Dr. Haruvy's review of that same data over a broader window than Boberg's three-months-each-side analysis shows Nature's Remedy's Tyngsborough prices dropped 35-50% around Yellow House's opening — a change not explained by general market dynamics and not mirrored at Nature's Remedy's Millbury store. SOF at 102. This further supports market power in, and antitrust injury from exclusion out of, the Tyngsborough submarket.

**4. The Evidence Establishes Causation and Damages**

The record shows Defendants' conduct delayed MJ's development: the Zoning Appeal dissuaded MJ's real estate partners from building until it was resolved and chilled investment, even

though those partners remained ready, willing, and able to proceed once it was. Jushi's delay ultimately caused the Town to lose patience and reissue its HCA solicitation. Without the Tyngsborough store, MJ's lacked the cash flow to complete its North Grafton cultivation and manufacturing build-out — its Grafton retail sales alone were insufficient to sustain the business plan — and MJ's lost its entire enterprise as a result. MJ's damages expert, Jon Klerowski, CPA, ABV, CFE, values MJ's lost profits at approximately $30-32M, with a market-approach cross-check yielding similar results. SOF at 96-97.

At minimum, the record contains genuine disputes of material fact on every rule-of-reason element, precluding summary judgment for Defendants at this stage of the proceedings. MJ's is prepared to prove its case under a full rule-of-reason standard at trial if required, but that showing is not a prerequisite to the per se and quick-look relief MJ's seeks here.

**III. CONCLUSION**

In light of the foregoing, Plaintiff respectfully requests that this Court grant partial summary judgment on liability for Count I (Sherman Act § 1) and Count III (G.L. c. 93A § 11), with damages — including the question of willful and knowing conduct triggering mandatory multiple damages under Chapter 93A — reserved for trial.

Respectfully submitted,

MJ'S MARKET, INC.,
By its attorneys,

*/s/ Michael J. Duffy*
Law Office of Michael J. Duffy, PLLC
60 Washington Street, Suite 301
Salem, MA 01970
617-620-6157
mike@mjdlawyer.com

*/s/ Eric J. Kfoury*
Eric J. Kfoury, BBO #552572
6 Martin Ave
North Andover, MA 01845
978.758.9595
eric@kfourylawandconsulting.com

Dated August 21, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent electronically to all counsel of record.

*/s/ Michael J. Duffy*